## TEXAS EMPLOYERS INS. ASS'N v. HUMBLE OIL & REFINING CO.

No. 10297.

Court of Civil Appeals of Texas. Galveston.

Jan. 28, 1937.

On Rehearing March 9, 1937.

CODY, Justice.

The question in the main action of this consolidated suit is, Did the Humble Oil & Refining Company, as a withdrawn subscriber. of the Texas Employers' Insurance Association, have such a right in the surplus funds of the association, accumulated during the period it was a subscriber, that it was entitled to withdraw a portion of such surplus?

On October 9, 1917, the Humble Company acquired the Texas properties and business of the Dixie Oil & Refining Company, and on the 24th of the same month, the association transferred to the Humble Company the policy of the Dixie Company, which authorized the holder to participate in dividends. This policy remained in effect until November 22, 1919, when a new policy, substituted for it, went into effect and remained in effect until it was canceled at the request of the Humble Company, midnight of May 31, 1922. But for the purpose of making all computations in this case, it was agreed by the parties that the Humble Company's membership as a subscriber continued the full six years of 1917–1922.

During the 1917–1922 period, the Humble Company collected from its subscribers, who formed the membership of Group I, to which the Humble Company belonged, premiums slightly in excess of $5,000,000, which was applied and distributed as follows:

| | |
|---|---|
| Claims paid, about | $3,000,000.00 |
| Expenses, about | 800,000.00 |
| Dividends returned to members of Group I, about | 1,000,000.00 |
| Retained for surplus, about | 58,000.00 |

Over the same period, the total premiums collected by the association, including those from Group I, was something in excess of $9,000,000, and was distributed as follows:

| | |
|---|---|
| Claims, about | $5,000,000.00 |
| Expenses, about | 1,400,000.00 |
| Dividends, about | 2,200,000.00 |
| Retained for surplus, about | 66,000.00 |

The Humble Company received its proportionate share of the dividends that were distributed to members of Group I during its membership. Its claim of the right of ownership in the undivided distributable surplus of the association as of May 31, 1922, the Humble Company bases on certain contractual obligations of its policy,

Sewell, Taylor, Morris & Garwood, of Houston, and Black & Graves, of Austin, for appellant.

R. E. Seagler and Lee M. Sharrar, both of Houston, for appellee.

Baker, Botts, Andrews & Wharton, of Houston, amicus curiæ.

and on provisions of the Workmen's Compensation Law (Vernon's Ann.Civ.St. art. 8306 et seq.) under which the association operates and with reference to which the policy of insurance was issued, and with reference to which the by-laws of the association are framed. It claims that the recognition and enforcement of this "withdrawal right," the right to participate in the surplus accumulated during a subscriber's membership at withdrawal, is the only means by which the contract of insurance, issued to a subscriber entitling him to participate in the association's surplus, and the association's by-laws, and the fundamental theory of the Workmen's Compensation Law, can be harmonized with the ends of justice and equity.

The trial petition of the Humble Company asserts its claim of a withdrawal right in this language:

"The method of operation of the Association has at all times been, and now is, in the nature of a reciprocal or mutual benefit insurance association, designed by the law creating it and intended by the Legislature in enacting the Workmen's Compensation Law, to create an agency clothed with the power and duty to furnish workmen's compensation insurance to employers at actual cost and without profit to anyone, and to return to the members thereof from time to time, and upon their retirement, their pro rata share of the net profits earned and accumulated by the Association; * * * that the profits and net surplus of the Association of whatever kind or character belong to and remain the property of the subscribers whose money produced the said profits and net surplus, and that upon retirement of a member from the Association it was intended that such retiring member should be entitled to his or its pro rata share of such surplus, * * * and that the Association should be trustee of all undistributed surplus for the use and benefit of the subscribers contributing or earning the same."

The provision in its policy, which it urges in support of its claim of a withdrawal right against the distributable surplus of the association, is this:

Section (15): "The Subscriber shall be entitled to an equitable participation in the funds of the Association in excess of the amounts required to pay all the compensation and other policy obligations which may be payable on account of injuries sustained and expenses incurred, together with the reserve funds required or permitted by law; such distribution shall be made by the Association only in accordance with the insurance law and the charter and by-laws of the Association."

The Humble Company has not classified the nature of the trust which, under its theory, puts the real ownership of the association's distributable surplus in its subscribers instead of in itself. The difficulty of identifying such alleged trust as being an express, a resulting, or a constructive trust seems, at first blush, about equal. Article 8308, which is part 3 of the Workmen's Compensation Law, definitely established the same status between the association and its subscribers (where, as in the instant case, the subscriber enjoys the status of non-assessability because of maintaining an admitted surplus of $200,000 or more), as that existing between the ordinary corporation and its stockholders. The only means provided by the act for transferring any part of the surplus to subscribers is by duly declaring a dividend. And improvident withdrawals of surplus by means of dividends are safeguarded against by the requirement, as a prerequisite to the distribution of a dividend, of the approval of certain state officials, at the time in question, of the commissioner of insurance and banking. The reason for this careful safeguarding of the assets of the association against being improvidently withdrawn in favor of subscribers is too clear to require discussion. But even if the reason for the Legislature's providing dividends duly declared by the directors as the only means of transferring the distributable surplus of the association to subscribers was not plain, the courts would none the less be bound by the Legislature's evident intention.

Sections 13, 15, 16, and 23 of article 8308, the Humble Company contends, when read in the light of the object and purposes of the creation of the association as defined in Middleton v. Power Company, 108 Tex. 96, 185 S.W. 556; City of Dallas v. Association, 245 S.W. 946, by the Amarillo Court of Civil Appeals; Texas Employers' Ins. Association v. Dallas (Tex.Civ.App.) 5 S.W.(2d) 614, 616, indicate that the association in collecting premiums on the policies from subscribers collected money which belonged to the policyholders for the specific purpose named in the law, and that the surplus belongs to the subscribers and not the association. We hold these cases

not authority for the proposition that the association is trustee of the surplus for the subscribers, nor for them being partners of each other in its ownership. The Middleton Case holds that the association was created by the Workmen's Compensation Law as the agency to provide funds for payment of the compensation to employees in accordance with the law, and that the Legislature in calling the association a corporation did not make it a *private* corporation, and so did not violate the constitutional inhibition against creating private corporations except by general laws. Texas Employers' Ins. Association v. Dallas (decided by the Dallas Court of Civil Appeals) was a case where the city of Dallas had levied a tax against the distributable surplus of the association, and the association was resisting its collection. In speaking of money collected by the association, which the court held to be taxable, it said:

"It is used to discharge the obligations incurred under the insurance policies issued by it, to pay the operating expenses, and if, at the end of any calendar year, there is a surplus beyond that required by the law to be maintained in order to write a non-assessable policy, such surplus is distributed in the form of dividends to the subscribers, who correspond to the stockholders of a private corporation."

If, by a fair construction of the foregoing language, it can be said that the court was undertaking to state the legal duty of the association with reference to disposing of its distributable surplus, then such language is dicta, for the court was passing upon the taxability of the surplus only. But that this was not the court's meaning is made clear in the opinion where it is said:

"The fund made subject to taxation is the surplus that existed at the close of each year for which taxes have been levied, and is *subject* to be returned in dividends to subscribers (i. e., not necessarily distributed)." (Italics ours.)

The meaning of the court is made even clearer, where it is said in its opinion:

"Consideration must be given to the fact that the Legislature has manifested a clear intention to place the Texas Employers' Insurance Association precisely on the footing as that of any other company writing compensation insurance. It must make the same character of annual report as is required from the other insurance companies, and must charge the same rate of insurance that they are permitted to charge. It is governed by the same rules in paying dividends to its subscribers."

The case of Dallas v. Association (decided by Amarillo Court of Civil Appeals) was an earlier case in which the association was claiming immunity from taxation. In support of its holding that the distributable funds of the association are not taxable, it did hold that it was the purpose of the act that neither the association nor any subscriber thereto should ever derive any profits from its business; and, further, that the association was a trustee of such funds, of such a character that in its possession they were free of liability to taxation. But the case was dismissed in the Supreme Court after writ of error granted, upon an affidavit showing, made in that court, that the association had discharged the entire claim for taxes, interest, and penalties, and was for that reason dismissed. 265 S.W. 1113. The Dallas Court of Civil Appeals expressly stated its inability to follow the holding of the Amarillo court, and a writ of error was refused in its case.

■ Ultimately, all premiums paid in by the subscribers, and remaining after payment of losses and the cost of operations, including the cost of maintaining a surplus deemed by the directors adequate, go to subscribers in the form of dividends, and during 1917–1922 did so go. The personnel of the subscribers may change, and during that period did change. But from the standpoint of the association, it furnishes insurance at cost. Calculated on the basis of its individual experience during 1917–1922, the Humble Company has received its insurance from the association for about $25,000 less than cost. In other words, the cost of the insurance of the Humble Company to the association, calculated on its individual experience, exceeded the cost to the association of the insurance calculated on the general experience of Group I (to which the Humble Company belonged) by that amount. But, of course, it is the very office and purpose of calculating the cost of the general experience of a group that the risks that happen to prove good shall help to carry those that prove bad. And these remarks are offered only to indicate that the cost of maintaining an adequate surplus reserve is a part of the necessary cost to the insured of insurance. The net amounts contributed to

surplus by the premium earned and paid by members of Group I, during the six-year period of 1917–1922 was about 1 per cent. of earned premiums. The association handled over $9,000,000 in premiums during this period, and retained only about seven-tenths of 1 per cent. in its surplus therefrom for future operations. We are clear that in so doing its directors did not abuse their discretion.

The authorities cited by the Humble Company, decided by courts of other states, do not relate to compensation insurance, but to different characters of contracts of insurance, and appear to be correctly decided under the facts presented in those cases. They are not in point here.

 The Humble Company further complains that it was not paid what it claims, alternatively in varying amounts, as its pro rata share of the association's surplus, out of the dividend declared by the association in 1924. The Humble Company does not show, and it does not contend, that it was treated with respect to such dividend differently from other withdrawn subscribers. There is nothing to prevent the board of directors, in the exercise of their discretion, to make refunds to withdrawn subscribers, provided all such withdrawn subscribers of the same groups are treated equally. But whether the directors shall make such refunds is addressed to their discretion as to the policy the association shall pursue in case of withdrawn subscribers, and not to the rights of the subscribers, except that in the case of refunds, the right not to be discriminated against. So long as a subscriber remains a subscriber, he enjoys the enhanced value of his policy because of the surplus of the association. In this case, when the Humble Company acquired the properties of the Dixie Company, it also acquired the policy carried by the Dixie Company in the association, so that in that case there was no loss of the enhanced value of the policy. Were the policies of insurance issued by the association of the same nature as shares of stock of ordinary corporations, then the Humble Company could have realized on the enhanced value of its policy by selling it. But the fact that there is no means by which it could realize on this enhanced value, other than by continuing to hold it, presents no reason why the courts should create such a means.

That the Legislature meant for the earned premiums to be the property of the as-sociation, instead of the subscribers, also seems evident from section 3 of article 8309, which provides that where a subscriber who has paid a premium, and then ceases to be a subscriber, he is entitled to the unearned portion thereof, subject, however, to any rule approved by the commissioner of insurance and banking as to minimums of short rate cancellation.

The judgment of the trial court allowing a recovery by the Humble Company against the association on the main action is reversed, and it is here rendered that on the main action the Humble Oil & Refining Company take nothing against the Texas Employers' Insurance Association.

## Cross-Action.

To the association's cross-action against the Humble Company for unpaid balances on premiums, the latter interposed the pleas of limitation, waiver, and estoppel. The premiums payable on the policy were based on the earnings of the employees of the subscriber and these were calculated on reports made to the association by the subscriber, who made payment each month when the report was made, but these payments were not final, and the association had the right during the period of insurance, and for one year after its termination, to examine the books of a subscriber to determine the correctness of the payments.

The evidence shows beyond all question that the Humble Company made what it believed to be correct reports and paid what it believed to be correct amounts of premiums, and the association did nothing about auditing the payrolls until April 20, 1923, after it received a demand from the Humble Company for what it conceived to be due it out of the association's surplus.

But as a result of this dispute, the parties agreed to accept as correct the statement of account with reference to the premiums claimed to be due by the association which should be made by two accountants, one of which was selected by each party. As a result of this audit, the amount due the association was found to be $16,812.17. It was also agreed that limitation should not run between May 30, 1924, and ten days after the final report of the accountants. As they completed their report on August 14, 1924, the period between May 30 and August 24, 1924, cannot be computed in connection with the plea of limitation urged by the Humble Company.

The association filed its suit for unpaid parts of premiums September 18, 1924, nearly three months after what is here the main action was filed. The Humble Company claims that on November 6, 1933, when the association filed its supplemental petition, it for the first time declared on the policy of insurance as the basis for recovering; that prior to that time it had merely declared on the account as stated by the accountants mentioned above, and that it then set up a new cause of action which was barred. The action set up by the association in its pleading filed September 18, 1924, states, "* * * the Humble Company * * * carried compensation insurance policies issued by the Association * * * for which policies the defendant agreed and promised to pay all premiums * * * that might be due or become due and according to said contracts of insurance. * * *"

The pleading then proceeds to refer to the report of the accountants, and referred to it as an arbitration, and sued for the amount of unpaid premiums as found by the account stated by the selected accountants to have been earned and unpaid. The agreement expressly provided that these points of law in issue between the Humble Company and the association should not be determined by the accountants. The Humble Company contends that the association brought suit on the accountants' report as upon an arbitration award. We do not so construe the pleading. Several years later, when the Humble Company moved the court to consolidate the suit of the association against it with its suit against the association, it construed the association's suit as one to recover payment of premiums, and stated it to be such in its motion for consolidation. As the Humble Company was claiming, in its suit, the right to recover out of the association's surplus on the ground that the surplus was made up principally of premiums, and that it was the true owner of a portion, the allegation that the association's suit to recover additional premium money, when, under the Humble Company's theory, the association really owed it premium money, must have caused the court to order the consolidation. But without entering upon whether in inviting the court to consolidate the causes it invited the court to commit what it now asserts to be error; namely, to consider the association's suit one for premiums, we rule that it was not in error in denominating the cross-action

suit one for unpaid parts of premiums. In the pleading filed by the association in 1933, which it concedes is for premium money, and which it claims set up a new cause of action, the allegations were, "by and under the terms of the written contract of insurance subsisting between the parties * * * the Humble Company is indebted * * * in the amounts set forth in the report. * * *"

It was not necessary to allege that the policies of compensation issued by the association were written in order to base a suit thereon. The worst that can be said of the allegations the Humble Company contends constitute a declaration upon an arbitration award is that they are a defective declaration on the policies of insurance issued by the association for unpaid premiums. But even before the act of 1931 (Vernon's Ann.Civ.St. art. 5539b), that has practically abolished claims that an amendment has set up a new cause of action which is barred by the statute of limitations, the courts were very liberal where the amended cause was not totally different. In Pope v. Ry. Co., 109 Tex. 311, 207 S.W. 514, 517, the Supreme Court quoted with approval, " 'Amendments are allowed expressly to save the cause from the statute of limitations, and courts have been liberal in allowing them when the cause of action is not totally different.' * * * There are in the history of the jurisprudence of every country certain epochs which mark the beginning of distinct trains of legal ideas and judicial conceptions of justice. There was a time in England and in this country when the fundamental principles of right and justice which courts were created to uphold and enforce were esteemed of minor importance compared to the quibbles, refinements, and technicalities of special pleading. In that period the great fundamentals of the law seemed little, and the trifling things great. The courts were not concerned with the merits of a case, but with the mode of stating it. And they adopted so many subtle, artificial, and technical rules governing the statement of actions and defense—for the entire system of special pleading was built up by the judges without the sanction of any written law—that in many cases the whole contention was whether these rules had been observed, and the merits of the case were never reached, and frequently never thought of. Happily for mankind, and for the law itself, that epoch is past in England and in

824

this country, and we now have an epoch in which substance is more considered than form, in which the justice and right of the cause determines its decision, and not some technical error or mistake in the pleadings. In England to-day the amendment complained of in this case would be allowed quite as a matter of course, and the suggestion that the defendant had gained some advantage by the mistake would not be entertained for a moment. There, as here, every error or mistake in the pleadings which does not affect the substantial rights of the adverse party may be cured by amendment; and what is meant by substantial right is a right going to the actual merits of the case. Such a right is not acquired by a mistake or error in pleadings which has not misled the other party to his prejudice. And the prejudice must be actual and irreparable, and not merely theoretical. At this day the party who seeks to profit by an error or mistake in pleading must be able to invoke the principle upon which the law of estoppel is founded."

■ Even a case stated so defectively that a general demurrer would have been sustained against the original pleading could be amended after the period of limitations had run. Western Union v. Smith (Tex.Civ.App.) 146 S.W. 332, 333; Boyd v. Beville, 91 Tex. 439, 443, 44 S.W. 287; Pope v. Ry. Co., supra.

■ The Humble Company claims the provision of the policy of insurance giving the association a year within which to examine the books of a subscriber to check up on his reports made to the association is a conventional limitation. We have a statute (R.S. art. 5545) that makes void contracts shortening the statutory period of limitations. The Humble Company voluntarily submitted to the examination of its books. No evidence has been cited that will support the plea that the association waived its claim for the payment of the unpaid premiums. It is not necessary, therefore, to decide whether, under the law, such payment can be waived. There was also no evidence to support the plea of waiver.

The judgment of the trial court that the Texas Employers' Insurance Association take nothing on its cross-action against the Humble Oil & Refining Company is reversed, and judgment is here rendered that the association recover the unpaid portion of premiums not barred by the four-year statute of limitations (Vernon's Ann.Civ. St. art. 5527) in the sum of $12,943.54, together with interest at 6 per cent. per annum, from January 3, 1935, the date of the judgment in the trial court.

Reversed and rendered.

On Appellant's Motion for Rehearing.

Courts of Civil Appeals are directed by article 1856, R.S.1925, where a judgment of the court below shall be reversed, to proceed to render such judgment as the court below should have rendered, except when it is necessary that some matter of fact be ascertained or the damage to be assessed or the matter to be decreed be uncertain. In the instant case, when the court below rendered judgment, it should have given judgment in favor of the association and against the Humble Company for the unpaid portions of premiums totaling the principal sum of $12,943.54, together with interest on each such unpaid portion of premium at the rate of 6 per cent. per annum from the date the Humble Company failed to pay same to the day of judgment, to wit, to January 3, 1935; and the court below should have provided in said judgment that the amount thereof, principal and interest, should bear interest from and after said date at the rate of 6 per cent. per annum. We accordingly directed the clerk of this court to enter judgment here, on January 21, 1937, the effective date of our judgment reversing and rendering the judgment of the court below, which the court below should have rendered on January 3, 1935. But the association has requested that the judgment rendered here on January 21, 1937, be for such principal and interest only as the court below should have rendered, had it rendered judgment herein on the date this court rendered judgment, to wit, January 21, 1937. In other words, the association doubts its rights to a judgment that will have the effect of giving it interest on interest from January 3, 1935, to January 21, 1937. On the strength of the association's waiver, we accordingly direct the clerk to calculate the interest on the unpaid portion of each such premium from the date it appears same should have been paid, until January 21, 1937, and add the interest so calculated to said principal, and provide in said judgment that such sum shall bear interest from and after January 21, 1937, at the rate of 6 per cent. per annum.