HOUSTON CHRONICLE PUBLISHING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 838. Promulgated August 21, 1944.

*Charles H. Draper, Esq.,* and *George W. Rice, Esq.,* for the petitioner.

*Samuel G. Winstead, Jr., Esq.,* and *Frank B. Schlosser, Esq.,* for the respondent.

## OPINION.

BLACK, *Judge*: The first question is whether the refunds of premiums on policies of workmen's compensation insurance in the amounts set out in our findings received by petitioner during the taxable years 1938 and 1939 from the Texas Employers' Insurance Association, hereinafter sometimes referred to as the association, are in reality "dividends" as that term is used in section 26 (b) of the Revenue Act of 1938 and of the Internal Revenue Code. This section is substantially the same in both the act and the code, and the material portion thereof is set out in the margin as it appears in the code.[1]

---

[1] SEC. 26. CREDITS OF CORPORATIONS.

In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

    \*        \*        \*        \*        \*        \*

(b) DIVIDENDS RECEIVED.—85 per centum of the amount received as dividends from a domestic corporation which is subject to taxation under this chapter, but not in excess of 85 per centum of the adjusted net income. \* \* \*

The tax-imposing section here involved is section 13 (c) of the Revenue Act of 1938 and of the code. It is identical in both places and is also set out in the margin.[2]

Petitioner's contentions may be concretely illustrated by showing the respondent's actual computation for the year 1938 (the computation for the year 1939 would be the same in principle) and the same computation as petitioner contends it should be made. The respondent's computation, taken from the statement attached to the deficiency notice, is as follows:

Tentative tax at 19% on adjusted net income of $253,055.27_____ $48, 080. 50
Less:
    14.025% of dividends received of $85,631.19 but not to
       exceed 14.025% of adjusted net income_____ $12, 009. 77
    Dividends paid credit (2½% of $194,931.25)_____ 4, 873. 28
                                        16, 883. 05

Correct income tax liability_____ $31, 197. 45

(The 14.025% is the product of the 16½% stated in section 13 (c) (2) (A) and the 85% stated in section 26 (b).)

Petitioner contends that the computation should be made as follows:

Tentative tax (same as respondent's) _____ $48, 080. 50
Less:
    14.025% of dividends received of $86,759.50 ($85,631.19
      plus the 1938 refund of $1,128.31) but not to exceed
      14.025% of adjusted net income_____ $12, 168. 02
    Dividend paid credit (same) _____ 4, 873. 28
                                          17, 041. 30

Correct income tax liability_____ $31, 039. 20

In contending that the refunds in question are in reality dividends, petitioner has offered no evidence other than the bare stipulation of the parties which we have set out in our findings under the caption of issue No. 1.

Petitioner relies principally upon the two cases of *Texas Employers' Ins. Assn.* v. *City of Dallas*, 5 S. W. (2d) 614, and *Texas Employers' Ins. Assn.* v. *Humble Oil & Refining Co.*, 103 S. W. (2d) 818. It also asks us to take judicial notice that the association is a corporation, taxable under section 207 of the Revenue Act of 1938 and of the code.

[2] SEC. 13. TAX ON CORPORATIONS IN GENERAL.
    \*       \*       \*       \*       \*       \*       \*
    (c) GENERAL RULE.—The tax computed under this subsection shall be as follows:
    (1) A tentative tax shall first be computed equal to 19 per centum of the adjusted net income.
    (2) The tax shall be the tentative tax reduced by the sum of—
    (A) 16½ per centum of the credit for dividends received provided in section 26 (b) ; and
    (B) 2½ per centum of the dividends paid credit provided in section 27, but not to exceed 2½ per centum of the adjusted net income.

Section 1 of article 8308 of Vernon's Civil Statutes of the State of Texas, which is Part 3 of the (Texas) Workmen's Compensation Law, provides as follows:

The "Texas Employers' Insurance Association" is hereby created a body corporate with the powers provided in this law and with all general corporate powers incident thereto. Acts 1917, p. 269.

In *Texas Employers Ins. Assn.* v. *Russell*, 127 Tex. 230; 91 S. W. (2d) 317, the Commission of Appeals of Texas, Section A, in referring to the association said:

The association is not a private corporation, but a governmental agency, set up for a proper administration of the Workmen's Compensation Law. *Middleton* v. *Texas Power & Light Co.*, 108 Tex. 96, 185 S. W. 556. It has no power to fix rates, but is charged with the public duty of collecting premiums assessed under the rates fixed by the insurance commission and paying from the fund so assembled the just claims of employees. * * *

Section 2 of article 8308, *supra*, provides that "The Governor shall appoint a board of directors of the association consisting of twelve members * * *." Section 7 provides that "Any employer of labor in this State * * * may become a subscriber to the Association." Sections 13 and 16 provide in part as follows:

Sec. 13. The board of directors may distribute the subscribers into groups for the purpose of segregating the experience of each such group as to premiums and losses, and for the purpose of determining dividends payable to and assessments payable by the subscribers within each group * * *.

* * * * * * *

Sec. 16. The board of directors may by vote fix the amount to be paid as dividends on the policies in force during each calendar year after retaining sums sufficient to pay all compensation which may be payable on account of injuries sustained and expenses incurred during the calendar year. * * *

In holding that the association was not exempt from state, county, and municipal taxation, the Court of Civil Appeals of Texas, in *Texas Employers' Ins. Assn.* v. *City of Dallas, supra*, said in part:

* * * the money collected by defendant * * * is used to discharge the obligations incurred under the insurance policies issued by it, to pay the operating expenses, and if, at the end of any calendar year, there is a surplus beyond that required by the law to be maintained in order to write a non-assessable policy, such surplus is distributed in the form of dividends to the subscribers, who correspond to the stockholders of a private corporation.

Employers of labor are permitted under the law to take out their compensation insurance in any other company that is permitted by the state to write this class of insurance, and when such insurance has been taken out such employer becomes a "subscriber" in the same sense and with the same privileges as he would if his insurance had been issued by defendant. The rate to be charged for such insurance is fixed by the state insurance commissioner, and is required by law to be the same for all companies writing this class of insurance. With reference to private corporations writing this class of insurance, the rate is unquestionably fixed on a basis that will secure to the stockholders an adequate

return for their investment. In the case of defendant, the subscribers are the stockholders, and the rate is also fixed on a basis that will insure them a return in dividends. That this has been done is demonstrated by a glance at the last annual report in this record. This report is of date December 31, 1923, and shows that for the ten years it had been in existence it had paid in dividends to subscribers the sum of $2,491,870.30. * * *

* * * * * *

The fund made subject to taxation is the surplus that existed at the close of each year for which taxes have been levied, and is subject to be returned in dividends to subscribers. * * *

*Texas Employers Ins. Assn.* v. *Humble Oil & Refining Co.*, *supra*, was a suit brought by a withdrawn subscriber against the association for a part of the surplus funds of the association that were accumulated during the period the plaintiff was a subscriber. In deciding for the association, the Court of Civil Appeals of Texas, Galveston, among other things, said:

* * * Article 8308, which is part 3 of the Workmen's Compensation Law, definitely established the same status between the association and its subscribers * * * as that existing between the ordinary corporation and its stockholders. The only means provided by the act for transferring any part of the surplus to subscribers is by duly declaring a dividend. * * *

* * * * * * *

Ultimately, all premiums paid in by the subscribers, and remaining after payment of losses and the cost of operations, including the cost of maintaining a surplus deemed by the directors adequate, go to subscribers in the form of dividends, and during 1917–1922 did so go. * * *

* * * * *

* * * There is nothing to prevent the board of directors, in the exercise of their discretion, to make refunds to withdrawn subscribers, provided all such withdrawn subscribers of the same groups are treated equally. But whether the directors shall make such refunds is addressed to their discretion as to the policy the association shall pursue in case of withdrawn subscribers, and not to the rights of the subscribers, except that in the case of refunds, the right not to be discriminated against. So long as a subscriber remains a subscriber, he enjoys the enhanced value of his policy because of the surplus of the association. * * *

It is true, as indicated above, that the state statutes and the decisions thereunder refer to certain payments made by the association to its subscribers as dividends. We do not think, however, that such statutes and decisions are decisive of the question here presented.

Section 26 (b), quoted in the margin, *supra*, allows a credit based upon the amount received as dividends from a domestic corporation which is subject to taxation under chapter 1. Resort must be had to section 115 (a) for the definition of "dividends" as used in section 26 (b). Section 115 (a) provides that the term "dividend" as used in this chapter means any distribution made by a corporation to its shareholders out of earnings or profits accumulated since February 28, 1913, or out of earnings or profits of the taxable year. The peti-

tioner was not a shareholder of the insurance association within the meaning of this definition, and for that reason alone the credit must be denied. Furthermore, we could not make a finding from the facts which have been stipulated that the "refunds of premiums" were made out of earnings or profits accumulated after February 28, 1913, or out of the earnings or profits of the taxable year.

True, in the case of *Texas Employers' Ins. Assn.* v. *City of Dallas, supra,* it is said that subscribers for insurance, like the petitioner, "correspond to the stockholders of a private corporation"; and later on, "the subscribers are the stockholders." However, the decisions of the Texas courts on this subject are not binding upon us in construing the provisions of section 26 (b). We must still decide whether this petitioner was a stockholder of this corporation within the meaning of section 115 (a). The word "stockholder" as used in that section takes its ordinarily understood meaning, i. e., a person who has a continuing investment in the business and assets of the corporation and whose money is at risk therein. Subscribers to insurance who are entitled to share only in such dividends as the directors of the insurance company may see fit to declare in any particular year, based upon the policies in force in that year, are unlike stockholders in the ordinary sense. They have no money at risk in the business; they have no continuing investment; and they have no voice in management.

For reasons stated above, we are unable to say that the refunds of premiums on policies of workmen's insurance which petitioner received during the two taxable years in question were dividends within the definition of section 115 (a) and within the meaning of section 26 (b). We would have to say that they were such dividends before we could decide in petitioner's favor on this issue. On this issue respondent is sustained.

This leaves undecided the question whether the Texas Employers' Insurance Association is a corporation taxable under section 207 of the Revenue Act of 1938 and of the code, a fact of which petitioner has asked us to take judicial notice. In view of our decision above, it is unnecessary for us to pass upon that question. Even if it is so taxable, the result would be the same.

*Issue No. 2.*—Although the assignment of error relating to this issue assigns error only as to the year 1939, petitioner, in stating in its petition the facts upon which it relies, alleges in part as follows:

\* \* \* Commissioner was erroneous in disallowing this proper bad debt adjustment for the year ended December 31, 1939 and if the adjustment is not proper for the year ended December 31, 1939, it does represent a proper adjustment for the year ended December 31, 1938.

Since the respondent in his brief has made no point of any defect in the pleading to raise the issue for the year 1938, we consider any

possible objection thereto as waived, and we approach this issue as involving the deductibility of the amount of $49,579.26 as "bad debts" in either the taxable years 1938 or 1939. The applicable statute for the year 1938 is section 23 (k) of the Revenue Act of 1938, the material provisions of which are set forth in the margin.[3] The applicable statute for the year 1939 is section 23 (k) of the Internal Revenue Code, as amended by section 124 of the Revenue Act of 1942, and the material provisions thereof are set forth in the margin.[4]

We think there are several reasons why petitioner is not entitled to the deduction in either of the taxable years 1938 or 1939. The parties have stipulated that petitioner "has kept its books and filed its federal income tax returns on the accrual basis of accounting, using the reserve method for bad debts." The parties have also stipulated that "During 1939 the Building Company paid to petitioner $15,362.74 [of the balance of $64,942.44 then owing petitioner by the Building Company] and petitioner charged to its reserve for bad debts the amount of $49,579.26 over and above that amount reasonably required to provide for bad debt losses due to ordinary trade notes and accounts receivable," and that:

> The amounts excluding the $49,579.26 item which is in issue in this case, which were added to petitioner's bad debt reserve at December 31, 1939, were sufficient, but not more than reasonably required to provide for bad debt losses due to ordinary trade notes and accounts receivable.

Construing the foregoing stipulated facts, we assume that the respondent has already allowed petitioner a deduction from its gross income for an addition to its reserve for bad debts as of December 31, 1939. In addition to that petitioner is now seeking a further deduction for a specific bad debt of $49,579.26. This it may not do as a matter of law. *Rhode Island Hospital Trust Co.* v. *Commissioner*, 29 Fed. (2d) 339; *Abraham Sultan*, 22 B. T. A. 889; *First Nat. Bank of Omaha* v. *Commissioner*, 49 Fed. (2d) 70. These same cases hold, however, that a taxpayer's rights are not to be determined on merely technical grounds and that if the amount claimed as a specific bad debt when added to the amount allowed as a reserve for bad debts

---

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions :

\* \* \* \* \* \* \*

(k) BAD DEBTS.—
(1) GENERAL RULE.—Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts) ; \* \* \*

[4] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions :

\* \* \* \* \* \* \*

(k) BAD DEBTS.—
(1) GENERAL RULE.—Debts which become worthless within the taxable year ; or (in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts) ; \* \* \*

does not in the aggregate exceed a reasonable reserve for bad debts, then the taxpayer is to be allowed the amount of the specific bad debt, if otherwise proved, not as a specific bad debt, but as an addition to the taxpayer's reserve for bad debts.

Hence in view of the facts which have been stipulated with reference to additions to petitioner's bad debt reserve for 1939 and the deduction which the respondent has allowed with respect thereto, we shall treat the questions which we have to decide with respect to the claimed deduction of $49,579.26, as:

(1) Did the $49,579.26 represent a debt which the building company owed petitioner for borrowed money, or did it represent a gift or contribution of capital which petitioner as parent corporation made to its insolvent subsidiary in 1938?

(2) If it be held that the $49,579.26 represented a debt which the building company owed petitioner for money loaned in 1938, did it become worthless in 1939?

This latter question will have to be answered only if it be held that the $49,579.26 in question represented a debt within the meaning of the applicable statute and the adjudicated authorities. If we should hold that the amount did represent a debt and that it became worthless in 1939, then under the facts which have been stipulated we would hold that under the authorities above cited petitioner would be entitled to add the $49,579.26 in question to its reserve for bad debts in 1939 and take it as a deduction from income for that year.

We shall now address ourselves to the inquiry as to whether the $49,579.26 represented a debt, within the meaning of the adjudicated cases, which the building company owed to petitioner for borrowed money.

It has been stipulated that the building company, to which the money was advanced in 1938, had been losing money for many years, that it owed petitioner more than $1,000,000, and that it "was insolvent in 1933, if not prior thereto and continued to be insolvent down through the calendar year 1938." If the sums of money which petitioner advanced to the building company in 1938 had been involuntarily advanced, that is to say, were advanced in order to make good a guarantee which petitioner had made of the building company's obligations when that company was solvent, then petitioner would have been entitled to the deduction in 1938, even though the advancement had been made to an insolvent debtor and was known to be uncollectible when made. See *Shiman* v. *Commissioner*, 60 Fed. (2d) 65; *Daniel Gimbel*, 36 B. T. A. 539. However, if the advancements in question were not made in fulfillment of a legal obligation of guarantee which petitioner had made of building company's obligations, but were voluntary advancements made to an insolvent subsidiary, they can not be

placed upon the books as debts and later deducted as bad debts. See *W. F. Young, Inc. v. Commissioner*, 120 Fed. (2d) 159; *Reading Co. v. Commissioner*, 132 Fed. (2d) 306.

In *W. F. Young, Inc., supra*, the taxpayer acquired all the stock of another company in 1932 for $210,000. At that time the acquired subsidiary was operating at a deficit. Thereafter the taxpayer advanced certain sums to the wholly owned subsidiary for operating expenses as follows:

| | |
|---|---|
| 1932 | $84,293.20 |
| 1933 | 56,750.00 |
| 1934 | 66,372.32 |
| 1935 | 30,894.88 |
| 1936 | 58,372.23 |

The above amounts were treated as loans on the books of the taxpayer and as liabilities on the books of the subsidiary, just as they were treated in the instant case. The taxable years involved were 1934, 1935, and 1936. During those years the taxpayer deducted as specific bad debts the amounts advanced during those respective years. The taxpayer did not use the reserve for bad debts method. The Commissioner disallowed the deductions on the ground that there was no expectation of repayment at the time the advances were made. The Board of Tax Appeals (now this Court) held that that fact did not prevent the taxpayer from deducting the advances either as bad debts or as losses. In reversing the Board the First Circuit, among other things, said:

The Commissioner contends that there can be no deduction for a debt ascertained to be worthless and charged off within the taxable year when the debt was worthless when contracted and when the creditor lent the money with no hope or expectation of repayment. We agree with the Commissioner.

\* \* \* \* \* \* \*

\* \* \* Such advances, made with the belief that they would not be repaid, are in the nature of gifts, and are not deductible as bad debts. [Citations.]

The First Circuit Court recognized, however, that a different rule existed if the advances were made as a result of a guarantee made at a time when the party guaranteed was still solvent. Petitioner contends that is the situation here. It contends that, under the guaranty agreements made in 1927 and in 1932 while the building company was still solvent, it was under obligation to pay approximately $94,000 a year if the building company failed to pay and that the net amount of $49,-579.26 here in question should be considered as a part of such guarantee. We do not think the evidence supports petitioner in this contention. There is no direct evidence that any part of the advances were made as a result of the 1927 and 1932 guaranty agreements. In fact, the parties have stipulated that "in 1938, petitioner paid to the Building Company $64,942.44 out of which latter payment $54,000.00 was used

by the Building Company to pay its obligation which had arisen out of" the December 1, 1930, lease for back rent for the years 1931, 1932, and 1933. Petitioner was not under any guaranty agreement to pay this back rent. The balance of the $64,942.44, or $10,942.44, was used by the building company for operating expenses, but if any of this $10,942.44 was used to pay obligations petitioner had guaranteed, the evidence does not show it.

Therefore, it seems clear to us that none of the $49,579.26 which petitioner here seeks to deduct as a bad debt was involuntarily advanced by petitioner to its subsidiary to make good an obligation of the subsidiary which it had guaranteed. Petitioner argues at considerable length as to the effect of certain book entries of petitioner and the building company which were embodied in a supplemental stipulation which was filed subsequent to the filing of the original stipulation of facts. We have examined these book entries carefully, and we do not think they in any way contradict the original stipulation of facts, wherein it is said:

* * * In addition to the payment of $126,580.00 in 1938, petitioner paid to the Building Company $64,942.00 out of which latter payment $54,000.00 was used by the Building Company to pay its obligation which had arisen out of a lease between the Building Company and the Houston Chronicle Realty Company, * * *

We think our findings of fact fully and fairly cover the facts embodied in both stipulations, as well as the brief oral testimony at the hearing, and that these facts show that the $49,579.26 which petitioner here seeks to deduct as a bad debt was not advanced by petitioner to its subsidiary to pay obligations which it had guaranteed, but, on the contrary, was advanced to pay obligations which petitioner had not guaranteed and which must be regarded under the circumstances as gifts or contributions of capital made by a parent corporation to its wholly owned insolvent subsidiary. We do not think petitioner can put such advancements upon its books as a debt against the subsidiary and deduct this debt as one which became worthless in 1939. *W. F. Young, Inc.* v. *Commissioner, supra; Reading Co.* v. *Commissioner, supra.* In his determination disallowing the deduction of the claimed bad debt in 1939 the Commissioner is sustained.

We shall next consider petitioner's alternative contention to the effect that, if the deduction of $49,579.26 is disallowed as a deduction for bad debt adjustment for the year 1939, it should be allowed as a proper adjustment for the year 1938.

In the first place, as we have already pointed out, petitioner keeps its books on the accrual basis and uses the reserve method of charging off bad debts. No facts whatever are stipulated as to petitioner's bad debt reserve at the close of 1938, or what, if any, additions

thereto were made. The record is wholly lacking as to the total amount of debts outstanding as of the close of the taxable year 1938, those arising currently as well as those arising in prior taxable years, the total amount of petitioner's existing reserve for bad debts as of December 31, 1938, and the other information required by the respondent's regulations, article 23 (k)–5. The Supreme Court has recently said that "an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer." See *Interstate Transit Lines* v. *Commissioner*, 319 U. S. 590. We think the petitioner in the instant proceeding has failed to meet that burden to sustain its alternative claim for the deduction in 1938. But even if its showing as to its bad debt reserve at the end of 1938 had been sufficient to comply with the Commissioner's regulations, which is not the case, as we have already pointed out, the deduction would have to be disallowed under the same authorities that we have cited in disallowing the deduction for the year 1939.

*Decision will be entered for the respondent.*