Lee Wilson & Company v. Commissioner.
Lee Wilson & Co. v. Commissioner
Docket No. 6953.
United States Tax Court
1948 Tax Ct. Memo LEXIS 269; 7 T.C.M. (CCH) 12; T.C.M. (RIA) 48003; January 20, 1948
*269 George E. H. Goodner, Esq., and Scott P. Crampton, Esq., Munsey Bldg., Washington 4, D.C., for the petitioner. James L. Lackstrom, Esq., Donald P. Chehock, Esq., and E. G. Sievers, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Deficiencies and overassessments were determined by respondent, and additional deficiencies were sought by amendment to answer, for the taxable years ended January 31, 1941, and January 31, 1942, as follows: Fiscal Year Ending
Fiscal Year Ending
January 31, 1941
January 31, 1942
Increases Sought
Increases Sought
Deficiency
by Amendment
Deficiency
by Amendment
Types of Tax
Notice
to Answer
Notice
to Answer
Income Tax
$ (224.12) [1]
$3,172.60
$ (21,635.55)
$ (7,904.11)
Declared Value
Excess Profits Tax
( 66.00)
934.11
936.78
Excess-Profits Tax
75,952.14
25,497.14
Some of the issues raised by the pleadings having been waived or otherwise disposed *270 of by stipulation and concession, or left for agreed disposition under Rule 50 computation, the following general questions remain: (1) Whether respondent understated petitioner's equity invested capital by failing to include as of February 1, 1940, January 31, 1941, and January 31, 1942, the fair market value on February 5, 1917, of lands acquired by petitioner on that date and still owned by petitioner as of the period involved. (2) Whether respondent understated petitioner's net equity invested capital by overstating its liability for road district improvement taxes which petitioner had accrued but which were forgiven by the State of Arkansas. (3) Whether respondent understated petitioner's net equity invested capital by accruing as liabilities in the balance sheets as of February 1, 1940, January 31, 1941, and January 31, 1942, Federal taxes for the three fiscal years ending on those dates. (4) Whether respondent understated petitioner's average invested capital by denying petitioner's claim to include therein 50 percent of its share of the average borrowed capital of Keiser Supply Company, a partnership in which petitioner had a 90 percent interest. (5) Whether, in arriving *271 at petitioner's equity invested capital, respondent overstated the deduction for inadmissible assets by including therein as "Stock in Corporations" certain "Certificates of Indebtedness" and "Certificates of Beneficial Interest" in the Delta Products Company, a cooperative association. General Findings of Fact Some of the facts have been stipulated, and as stipulated are hereby found accordingly. Petitioner is a common law business trust, organized on February 5, 1917, with its principal place of business at Wilson, Mississippi County, Arkansas. The parties are agreed that for Federal tax purposes, petitioner should be treated as a corporation. Since its organization, petitioner has been engaged principally in the production of cotton, and also in lumbering, agriculture, manufacturing, and mercantile businesses. All of its certificates of beneficial interest were issued in 1917 for the assets formerly belonging to Lee Wilson and Company, a corporation, subject to the corporation's existing liabilities. Its tax returns, prepared on a fiscal year (January 31) - accrual basis were filed with the collector for the district of Arkansas. Petitioner paid the taxes shown to be *272 due on its returns on the dates and in the amounts as follows: Fiscal Year
Nature of Payment
Date Paid
Amount Paid
1941
Income and Declared
4/15/41
$22,478.91
Value Excess-Profits Taxes
7/15/41
22,478.91
10/14/41
22,478.91
1/15/42
22,478.91
1942
Income and Declared
4/15/42
53,519.86
Value Excess-Profits Taxes
7/15/42
53,519.86
10/15/42
53,519.86
1/15/43
53,519.87 As a result of a preliminary audit of these returns additional taxes were assessed against petitioner in the amounts and for the years as follows: Amount
Fiscal Year
Kind of Tax
of Tax
1941
Income
$11,636.05
1941
Declared Value
Excess-Profits
2,355.73
1942
Income
11,317.37
Declared Value
Excess-Profits
5,551.86 These taxes were assesed on November 6, 1942, and were paid by petitioner on November 27, 1942, together with interest thereon in the amounts of $1,050.97, $212.77, $343.14, and $168.33, respectively. In making the payments petitioner also paid an additional amount of $64.29, representing interest from November 11 to November 27, 1942, on the assessments. The total taxes paid by petitioner for the fiscal *273 years 1941 and 1942 were as follows: Fiscal
Assessed on
Additional
Year
Kind of Tax
Return
Assessment
Total
1941
Income tax
$84,909.53
$11,636.05
$96,545.58
Declared value excess-profits tax
5,006.11
2,355.73
7,361.84
Excess-profits tax
None
None
None
Totals
$89,915.64
$13,991.78
$103,907.42
1942
Income tax
$188,176.82
$11,317.37
$199,494.29
Declared value excess-profits tax
25,902.53
5,551.86
31,454.39
Excess-profits tax
None
None
None
Totals
$214,079.35
$16,869.23
$230,948.68
On March 13, 1944, petitioner filed a waiver on Treasury Department Form 872 covering its fiscal year 1941. On November 25, 1944, petitioner filed with the collector for the district of Arkansas, two claims for refund on Treasury Department Form 843 covering the income taxes and declared value excess-profits taxes paid by it for its fiscal year ended January 31, 1941. Issue 1 Findings of Fact Included in the assets received by petitioner at the time of its organization were approximately 25,150 acres of land in Mississippi County, Arkansas, of which approximately 10,000 acres consisted of cleared land, the remainder being *274 cut-over or timbered land; also acquired at that time were approximately 280 acres, located at the townsites of Amorel, Bassett, Evadale, and Wilson. Mississippi County, Arkansas, is in the northeastern part of the state and is bordered on the north by the State of Missouri and on the east by the Mississippi River. The land is flat with a drop of about one foot to the mile to the southwest - away from the Mississippi River. The average rainfall in Mississippi County is about 45 inches a year. Prior to 1914 the land was subject to being flooded when the Mississippi overflowed. The levee broke in both 1912 and 1913 and as a result the county was flooded. After 1913 and prior to 1917 the levee was improved and raised all along Mississippi County, and the county has not been flooded since 1913. Climatically, Mississippi County is ideally located for the growing of cotton in that it is too far north for the boll weevil and other insect pests that attack cotton, and yet it is not too cold to raise the crop. It contains some of the richest agricultural land to be found anywhere in the South. MississippiCounty produces the largest yield per acre of any county in the United States, and *275 its cotton has a longer staple and stronger fiber than cotton raised in Mississippi, Louisiana, Oklahoma, Tennessee, and Missouri. Originally, water stood on low areas of Mississippi County for weeks at a time or throughout the year. These swampy locations were called lakes. Between 1910 and 1917 various drainage districts were created and numerous drainage ditches were installed as part of what is known as Drainage District No. 9. Drainage District No. 9 was substantially completed by February 5, 1917. The lateral ditches in Drainage District No. 9 were too large, and caused overflowing in the southern part of the district, and the area covered by this district required redredging. It was recognized that Drainage District No. 9 was inadequate to drain properly the bulk of petitioner's lands in the area; and to permit the clearing of the lands and successful cultivation additional drainage facilities were needed. Because of this situation land owners in this territory petitioned for the creation of a new drainage district. Accordingly, Sub-district No. 3 was created and installed about 1922. This would not have been necessary had District No. 9 been successful. Sub-district No. 3 *276 was superimposed upon District No. 9, with the exception of a narrow strip in the extreme western part of the county. Between 1913 and 1917 there was a rise in the value of lands in Mississippi County. Changes in the value of such land tend to follow the price trend of raw cotton. According to records of the Memphis Cotton Exchange, the average prices of upland grades of cotton at Memphis were quoted by the Exchange as follows: Dates
Middling
2/1/1915
8 cents
2/1/1916
12 cents
3/1/1916
11.38 cents
4/1/1916
12 cents
5/1/1916
12.12 cents
6/1/1916
13 cents
7/1/1916
13.12 cents
8/1/1916
13.37 cents
9/1/1916
15.75 cents
10/2/1916
16 cents
11/1/1916
18.75 cents
12/1/1916
20.50 cents
1/2/1917
18 cents
2/1/1917 to 2/5/1917 inclusive
Quotations
Suspended
2/6/1917 to 2/28/1917 inclusive
17 cents
3/1/1917
17 cents
4/2/1917
19 cents
5/1/1917
20 cents
6/1/1917
21.50 cents
7/2/1917
26 cents
8/1/1917
25.50 cents
9/4/1917
24.50 cents
10/1/1917
24 cents
11/1/1917
28.50 cents
12/1/1917
29.75 cents
The bulk of petitioner's cut-over and timber lands is located in the western portion of the county; the cleared lands are located *277 largely (1) in the vicinity of the town of Wilson, and (2) to the east of Blytheville, in the northeast portion of the county. The soil of over 90 percent of the cut-over and timber lands and of about 75 percent of the cleared lands was known as Sharkey clay. In a bulletin prepared by the United States Department of Agriculture and released in 1916, entitled "Soil Survey of Mississippi County, Arkansas," for the field season of 1914, it was reported that: "The Sharkey soils * * * are the most important in the county. They are poorly drained for the most part." It was further reported that "The value of the typical Sharkey clay land at present ranges from about $25 to $40 an acre for cut-over land without improvement." The general sales price of cut-over land in Mississippi County at the time material to this proceeding ranged from $20 to $35 per acre; for cleared lands, the range was from $75 to about $100 per acre. Petitioner's townsite lands, comprising approximately 280 acres, included industrial, business, and residential sites, some of which were subdivided into lots. There were about 17 acres at Basset, 30 acres at Evadale, 50 acres at Amorel, and 190 acres at Wilson. *278 The parties are agreed that the issue is the fair market value as of February 5, 1917, of the naked lands without timber or improvements. In his deficiency notice dated October 21, 1944, for the fiscal year ending January 31, 1941, respondent states that he included in his determination of petitioner's total equity invested capital in lands and improvements an amount of $1,596,742.73, representing the fair market value of the land, without improvements, owned by petitioner on February 5, 1917, and still on hand as of February 1, 1940. In its amend&d petition petitioner is claiming $1,754,762 as the fair market value as of February 5, 1917, of the lands in controversy. In his amendment to answer to amended petition, respondent contends that the fair market value of said lands was not in excess of $1,150,000. As of February 5, 1917, the average fair market value per acre of petitioner's cut-over and timber lands was $30. The fair market value of all of petitioner's lands, material to this proceeding, as of February 5, 1917, was $1,596,742.73. Opinion Petitioner owned a total of approximately 25,150 acres, of which some 10,000 acres was cleared land and the balance was wooded *279 or cut-over. [2] The parties' principal differences in computing the capital represented thereby for excess-profits tax purposes are as to the precise breakdown between cultivable and uncleared land and as to the value of the respective types of land. Respondent contends for an individual acreby-acre valuation, and petitioner insists that average values can be found. On none of these disputed elements does the evidence so clearly and unmistakably lead to a given result that it can be said categorically what figures should be used. As we said in Estate of Amy H. DuPuy, 9 T.C. 276, 284: "The evidence does not lead irresistibly to any amount as the obviously correct value * * *." A preponderance of the evidence points to an average value of from $90 to $100 for the cleared land and from $25 to $35 for the timber and cut-over *280 lands. [3] Using the mean figures of $95 and $30, respectively, and granting petitioner's value of $166,000 for the townsites and a total of 25,184 acres for the remaining land would still produce a total valuation of about $1,575,000. This is the figure at which we would arrive without the benefit of any presumption. Respondent contends, however, that his deficiency notice determined a value of $1,596,742.73 and on that premise this determination would be presumptively correct. The burden of reducing the figure below this would fall upon respondent. Rule 32, Rules of Practice before the Tax Court; Kimbell-Diamond Milling Co., 10 T.C. No. 2 (Jan. 6, 1948). Since the evidence as to total acreage, divisions between the various types of land, and fair market values for specific parcels is not sufficiently compelling to conclude that any such burden has been borne by respondent, we have found as a fact that the total value of the lands in question on the determinative date was the figure mentioned of $1,596,742.73. *281 Some of the cut-over land was sold during the tax year, and, for the purpose of determining petitioner's gain on the sale, a specific cost figure must be found. For this limited purpose we have found as a fact that the fair market value on February 5, 1917, and consequently petitioner's cost, for the parcels in question, was $30 per acre. Issue 2 Findings of Fact During the year 1941 and for several years prior thereto petitioner accrued certain amounts as a liability for road taxes assessed for certain road district improvements. These amounts were claimed as deductions in income tax returns for those years, and for the years prior to 1941 were not challenged by respondent. They appeared as liabilities on petitioner's books under the designation "Accrued Taxes, Arkansas Land Districts." For the year 1941 the amount accrued and deducted has been disallowed by respondent. The amounts so claimed by petitioner and allowed by respondent and remaining unpaid as of February 1, 1940, January 31, 1941, and January 31, 1942, were $40,308.18, $31,599.22, and $31,599.22, respectively. On March 15, 1939, the State of Arkansas by an Act of its legislature forgave the road improvement *282 taxes accrued as aforesaid. The parties have agreed that the road improvement taxes accrued by petitioner for its fiscal year 1941 amounting to $14,153.28, and deducted in its return for that year should be restored to taxable income for that year and that the amount should also be included in surplus in petitioner's balance sheets as of the beginning of its fiscal years 1941 and 1942. In its amended petition petitioner asserts that exhibits containing its balance sheets as of January 31, 1941, and January 31, 1942, "set forth the correct liabilities as of the respective dates." The item "taxes accrued" of $92,701.77 is asserted to be subject to an "adjustment" of $45,752.50. This figure is apparently composed of the amount of $14,153.28, disposed of as set forth above by agreement of the parties, and a balance of $31,599.22 still in issue as a proposed addition to petitioner's equity invested capital. Opinion The only possible authorization for including the accrued forgiven taxes in petitioner's equity invested capital would be as money paid in, property paid in, or earnings or profits at the beginning of the year. Internal Revenue Code, section 718 (a) (1) *283 , (2), and (4). Petitioner does not specify which subsection it considers applicable, but it seems clear that the forgiveness was not a part of its earnings and profits at the beginning of the year since it was not included in its income for any previous year, and it is equally clear that "the aggregate amount of debts forgiven by taxpayer's creditors * * * and credited to surplus account * * * was not includible in the taxpayer's 'equity invested capital' * * * as 'paid-in surplus or as a contribution to capital'." McKay Products Corp., 9 T.C. No. 141 (Dec. 8, 1947). See also Doylestown and Easton Motor Coach Co., 9 T.C. 846. Accordingly, on this issue respondent's determination is sustained. Issue 3 Findings of Fact Included in proposed equity invested capital for the fiscal years 1941 and 1942 are earnings and profits as of the beginning of those respective years which respondent has diminished by the amount of accrued but unpaid tax liabilities for the respective preceding years in the amounts of $74,340.07 and $84,567.47. This action was taken in reliance on respondent's regulation reading as follows: "* * * In computing accumulated earnings and *284 profits as of the beginning of the taxable year, a taxpayer keeping its books and making its income tax returns on the accrual basis shall subtract the income and excess profits taxes for the preceding taxable year. * * *" [Regulations 109, section 30.718-2]. Opinion Although the parties discuss this issue with respect to both fiscal years 1941 and 1942, no deficiency in excess-profits tax has been determined for any year excepting 1942. The result is that we have no jurisdiction for any other year. Pioneer Parachute Co., 4 T.C. 27; D. L. Blackstone, Administrator, 12 B.T.A. 456. The issue properly before us can be disposed of upon authority of and in accordance with a quotation from Lisk Manufacturing Co. Ltd., 11 B.T.A. 179: "* * * The liability to pay these taxes existed at the beginning of the year ( United States v. Anderson, 269 U.S. 422 * * *) and was none the less real because petitioner did not know of its additional liability. Earned surplus is not properly computed until provision for all liabilities has been made. The action of the Commissioner was proper, but the amount deducted from earned surplus for such *285 additional taxes must be adjusted to accord with the tax liability computed in accordance with this opinion." Issue 4 Findings of Fact Petitioner is a partner in a merchandise and supply business, trading as Keiser Supply Company, and located at Keiser, Arkansas, hereinafter sometimes referred to as the Company. Throughout the period here involved petitioner had a 90 percent interest in the partnership and included 90 percent of the income of the partnership for each year in petitioner's tax returns for the respective years here involved. The average borrowed capital of the Company during petitioner's fiscal year 1941 was $6,866.47, of which 90 percent is $6,179.82. The average borrowed capital of the Company during petitioner's fiscal year 1942 was $61,267.81. During petitioner's fiscal year 1941 the Company paid interest of $2,069.91. During petitioner's fiscal year 1942, the Company paid interest of $3,919.19. Petitioner's average borrowed capital (exclusive of the average borrowed capital of the Company) for the fiscal years ended January 31, 1941, and January 31, 1942, was $1,018,069.83, and $1,047,586.68, respectively. These are the amounts shown on petitioner's tax *286 returns for these years. Respondent did not include 50 percent of the 90 percent of the borrowed capital of the Company in arriving at petitioner's average invested capital for the respective years. Opinion Since the income from the partnership is included in petitioner's income and petitioner has charged itself with the deduction for its share of the interest paid by the partnership called for under section 711 (a) (2) (B); there seems no reason to deny it the credit in borrowed invested capital for its share of the partnership indebtedness. This conclusion accords with the provision in respondent's regulations that borrowed capital consists of "Outstanding indebtedness * * * including indebtedness assumed or to which the taxpayer's property is subject." Regulations 109, section 30.719-1. In this respect the deficiency is disapproved. Issue 5 Findings of Fact During the fiscal years 1941 and 1942 petitioner owned "Certificates of Indebtedness" and "Certificates of Beneficial Interest" of Delta Products Company, a cooperative association organized under the laws of Arkansas, hereinafter sometimes referred to as Delta. Delta is the successor to a corporation organized *287 in 1935, of which petitioner was a stockholder. In 1937 the corporation was liquidated and the cooperative association was organized and was designated in its articles of incorporation as a "non-profit corporation." The cooperative acquired the assets formerly held by the corporation and has since then operated the cotton seed oil mill formerly run by the corporation. The cooperative issued its certificates of indebtedness to the stockholders of the former corporation for the assets. Under Delta's by-laws cotton producers were entitled to membership in the cooperative upon the payment of $100. Petitioner paid the $100 and became a member on September 6, 1937. Members were obligated to sell all of their cotton seed to the cooperative and only members were entitled to have their cotton seed processed by it. The certificates of indebtedness, non-negotiable in form, were stated to be "direct obligations" of Delta and to constitute "a mortgage on all fixed assets" until fully redeemed. Under Delta's by-laws it was provided: "There shall be issued to incorporators, each in the amount of their capital contribution, interest bearing 'Preferred Certificates of Indebtedness' the aggregate *288 amount of which shall not exceed $300,000.00." * * *
Provision was made for amortization of the principal; interest at the rate of 7 percent per annum was payable on the unpaid balance. The holders were not entitled to any voice in management unless principal and interest were in arrears for three years and certain other conditions prevailed. During the fiscal years 1941 and 1942 petitioner held certificates of indebtedness in Delta for the periods and in the amounts as follows: February 1, 1940, to August 23,
1940, inclusive
$182,000.00
August 24, 1940, to January 31,
1941, inclusive
159,250.00
February 1, 1941, to September
29, 1941, inclusive
159,250.00
September 30, 1941, to January
31, 1942, inclusive
The by-laws of Delta further provided for the division of its profits or income each year among its members in the same proportion as the ratio of cotton seed delivered by each member bore to the total seed delivered. Instead of distributing all of the income each year, Delta withheld some. A portion was used in its business, and another portion was used to reduce its indebtedness. Delta then issued to its members the certificates of beneficial *289 interest in lieu of the member's share of the distributable income, withheld as aforesaid. During the fiscal years 1941 and 1942 petitioner held "Certificates of Beneficial Interest" of Delta for the periods and in the amounts as follows: February 1, 1940, to August 31,
1940, inclusive
$12,728.50
September 1, 1940, to January 31,
1941, inclusive
19,163.22
February 1, 1941, to August 31,
1941, inclusive
19,163.22
September 1, 1941, to January 31,
1942, inclusive
25,884.22 These certificates represented earnings due petitioner, but which were withheld. There is no provision for their payment except that, if the cooperative is profitable, an interest in its assets may at some future time inure to petitioner. The certificates do not confer voting rights or represent rights of control, and the only rights thereunder are an interest in the business and its profits. In arriving at the invested capital on which the excess-profits credit is based for the fiscal years 1941 and 1942, respondent determined that both types of certificates were the equivalent of stock and hence inadmissible assets for purposes of computing excess-profits tax credit. Opinion Inadmissible *290 assets are excluded in order to eliminate from the base for determining the excess-profits credit computed by the capital method such assets as produce income which is not includible in excess-profits net income. House Rept. 2894, 76th Cong., 3rd Sess., p. 26; 7A Mertens, Law of Federal Income Taxation, 619. Dividends on corporate stock being the subject of a credit against income, such stock is an inadmissible asset. But interest on fixed obligations is not so excludible. It is rather deductible as an expense by the debtor corporation. Generally speaking, the certificates of indebtedness of the cooperative are apparently such evidences of indebtedness as would permit the deduction of interest by the cooperative and require its inclusion in the income of the recipient. See, e.g., Richmond, F. & P.P. Co., 33 B.T.A. 895 affirmed (C.C.A., 4th Cir.), 90 Fed. (2d) 971; see also Houston Chronicle Publishing Co., 3 T.C. 1233, 1240-41. The opposite, however, is the case with respect to the certificates of beneficial interest on which there was no fixed obligation, no payment comparable to interest, and merely a preferential right to share in the cooperative's *291 assets. These resemble shares of preferred stock. See Swoby Corp., 9 T.C. 887. It follows that respondent erroneously excluded the certificates of indebtedness but correctly treated the certificates of beneficial interest. Decision will be entered under Rule 50. Footnotes
1. Amounts in parentheses indicate overassessments. It is not apparent that this Court has jurisdiction except as to excess-profits and declared value excess-profits taxes for 1942.↩
2. Respondent contends for a total of 25,133 acres and petitioner of 25,184 acres - a difference of 51 acres. Even if it were all considered to be cleared land at the value contended for by petitioner of $100 an acre, the difference would represent a monetary figure of only $5,100, clearly insufficient to affect the result to any appreciable extent.↩
3. A civil engineer and surveyor, formerly employed as a special agent of the General Land Office, and called as a witness by respondent, was of the opinion that the fair market value of petitioner's cut-over and timbered lands ranged from $15 to $25 per acre, and, of the cleared lands, from $75 to $90 per acre, as of February 5, 1917. A civil engineer and appraiser, called as a witness by petitioner, was of view that $100 per acre was the average fair market value for cleared lands, $35 per acre for cut-over land, and $30 per acre for timber land. Another witness, called by petitioner, an attorney by profession, familiar generally with the land of the region, was of the opinion that the cleared lands had an average value per acre of $100 and the cut-over and timbered lands an average value of $35 per acre, with a range in each case from least valuable to most valuable of about $25 an acre.↩