NEW YORK WATER SERVICE CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 16076. Promulgated May 19, 1949.

*Francis L. Casey, Esq.*, for the petitioner.
.*Henry C. Clark, Esq.*, for the respondent.

**OPINION.**

HILL, *Judge*: There are two principal questions for our determination in this case. First, we must decide whether petitioner was entitled under section 23 (k) (1) of the Internal Revenue Code,[2] as amended, to deduct as a reasonable addition to its reserve for bad debts for the year 1941 the sum of $475,000 or any lesser amount to cover the open account indebtedness of South Bay to petitioner. Secondly, we must consider whether petitioner was required to accrue and report as income for the taxable years 1941, 1942, and 1943 unpaid interest due on its open account with South Bay in the respective sums of $8,829.57, $14,249.60, and $14,250.40. If it should be held that petitioner is entitled to a deduction of $475,000 in 1941, then we must examine its contention that this results in a net operating loss of $197,437.92 which it is entitled to carry over to the year 1942.

What constitutes a reasonable addition to a reserve for bad debts must be decided in the light of the particular facts of each case. The burden of proof is on petitioner to show the $475,000 addition to its reserve in 1941 was reasonable, since allowance of the addition as a deduction for bad debts is by the language of the statute left within the discretion of the Commissioner, and he has disallowed the deduction of the $475,000 in full. As we said in *Walter H. Goodrich & Co.*, 40 B. T. A. 960, 961–962:

* * * Unless his [the Commissioner's] refusal to permit such a deduction is capricious or arbitrary, or otherwise an abuse of discretion, the Board should be slow to override it. Certainly it may not merely substitute its judgment for that of the Commissioner as if the statute contained no such condition and the Board were simply to decide *de novo* whether the claimed addition to the reserve were reasonable. * * *

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

* * * * * * *

(k) BAD DEBTS.—

(1) GENERAL RULE.—Debts which become worthless within the taxable year ; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts ; * * *

[By virtue of section 124 (d) of the Revenue Act of 1942 and section 113 (b) of the Revenue Act of 1943, the above portion of section 23 (k) (1) was effective for taxable years beginning after December 31, 1938.]

See *C. P. Ford & Co.*, 28 B. T. A. 156, and *Art Metal Const. Co.* v. *United States*, 17 Fed. Supp. 854.

It is clear that where a specific account of a taxpayer becomes worthless during the taxable year, the full amount of it may be included in its addition to reserve for bad debts and deducted if the aggregate addition to the bad debt reserve is reasonable. *Rhode Island Hospital Trust Co.* v. *Commissioner*, 29 Fed. (2d) 339; *First National Bank of Omaha* v. *Commissioner*, 49 Fed. (2d) 70; *Abraham Sultan*, 22 B. T. A. 889; *Houston Chronicle Publishing Co.*, 3 T. C. 1233; *William Purvin*, 6 T. C. 21. Thus the question for our determination becomes whether the open account indebtedness of South Bay to petitioner was worthless in 1941.

Both parties agree that on the basis of *New York Water Service Corporation* v. *Hoey*, U. S. Dist. Ct., So. Dist. N. Y., Civil 13–221, Apr. 6, 1943, which held that petitioner's common stock in South Bay was not worthless in 1936, the open account indebtedness of South Bay to petitioner also was not worthless in 1936. But petitioner contends that circumstances after 1936 were such that there was no reasonable probability of payment in 1941. In examining the points upon which petitioner relies to prove the debt to be worthless, we are limited to facts known at the close of the year 1941; subsequent facts may be used only to evaluate the soundness of petitioner's decision that the debt was worthless in 1941 and not as evidence of the fact of worthlessness. *Peyton Du-Pont Securities Co.* v. *Commissioner*, 66 Fed. (2d) 718; *Farmville Oil & Fertilizer Co.* v. *Commissioner*, 78 Fed. (2d) 83; *Apex Brewing Co.*, 40 B. T. A. 1110; *Shield Co.*, 2 T. C. 763.

In support of its position petitioner lays great stress on the general financial deterioration of South Bay during the years from 1937–1941. Specifically it points out that South Bay suffered a net loss in each of these years except 1937, and that, despite the increase in operating revenue, its expenses and debts grew correspondingly. Petitioner contrasts the earned surplus of $163,535.68 in the financial statement of South Bay for 1936 with the deficit of $243,516.38 on its books in 1941, a difference of over $400,000. Furthermore, petitioner shows that South Bay ceased to pay interest on the balance of advances in petitioner's open account after May 1941 even at the reduced rate of 3 per cent. Petitioner contends it was known in 1941 that South Bay would be unable to meet the sinking fund payments on its first and refunding mortgage 25-year 5 per cent gold bonds and that the $2,898,000 mortgage exceeded the value of South Bay's properties. The fact that, before the Securities Exchange Commission approved a proposed recapitalization of Federal Water Service Corporation it was necessary for the latter in June 1941 to mark down the value of a $227,960 demand note of

South Bay to $1,000 as a part of a general revaluation, is emphasized by petitioner as corroborating evidence that the open account indebtedness of South Bay was worthless in the same year.

While the specific points outlined above were important elements in South Bay's financial history from 1937–1941, yet when they are weighed in their true light and when factors which point to the economic soundness of South Bay during this period are also included in the evaluation of South Bay's economic position, the conclusion is inevitable that South Bay was far from insolvency or receivership at the close of 1941.

In analyzing the net losses suffered by South Bay in the period 1938–1941, we note that they were never large and in 1941 the net loss was barely over one-half the loss suffered in 1936, when petitioner admits its advances to South Bay were not worthless. South Bay's operating revenue, always large, showed a steady rise except in 1940, and was always substantially in excess of operating expenses, but depreciation, taxes, and interest accrued on long and short term obligations kept South Bay from showing a profit in these years. One big factor in causing the net losses after 1937 resulted from a change in the accounting system employed by South Bay in 1938 in conformity with the Uniform System of Accounts prescribed by the Public Service Commission of New York. As a result of this change the charge against income for depreciation in 1938 was approximately $40,000 greater than would have been required on the old basis, and this difference continued in substantially the same amount during the ensuing years. Such a circumstance does not affect the possible future earning capacity of South Bay. We conclude therefore that in no year were the net losses so severe as to support the view that South Bay was in any immediate financial danger, and that the continued margin of operating revenue over operating expense gave hope in 1941 of eventual financial recovery.

Petitioner emphasized the change from South Bay's earned surplus of $163,535.68 in 1936 to a deficit of $243,516.38 in 1941. While the aggregate of net losses in the years 1938–1941 accounted for a sizeable portion of this decrease in the surplus account, yet $302,616.51 out of the $407,052.06 total amount of decrease arose from changes in South Bay's accounting, as outlined in the findings of fact, and is not indicative of the future earning capacity of South Bay.

Petitioner stresses that South Bay ceased to pay interest on the open account advances from petitioner after May 1941 even at the reduced rate of 3 per cent. This fact is at least in part offset by the absence of any evidence that petitioner attempted to enforce collection of the interest in any manner, by the fact that repayments by South Bay in 1941 on the principal of petitioner's advances far exceeded the

amount of interest due, and by an unbroken record of interest payments on this obligation through May 1941.

The financial statement of South Bay for 1941 does state, as alleged by petitioner, that it probably would be unable to meet the sinking fund payment of $100,155 in cash or by delivery of canceled bonds in 1942, as required under the trust indenture for the first and refunding mortgage 25-year 5 per cent gold bonds. While this is a sign of possible future financial weakness in South Bay, yet up to the close of 1941 South Bay had met the sinking fund payments regularly in every year. It is noteworthy that there is no suggestion in the South Bay financial statement for 1941 that it would not pay interest on these bonds in the future as it had in the past.

Petitioner raises the question of the proper valuation of South Bay's properties by asserting that at the close of 1941 the market value of the company's plant and property was exceeded by the $2,898,000 first and refunding mortgage 25-year 5 per cent gold bonds. Petitioner has failed to convince us that the properties of South Bay at the end of 1941 were insufficient to pay off the secured creditors and still cover the unsecured creditors, such as petitioner.

Petitioner has consistently contended that the South Bay properties were worth only $2,991,100 in 1934 as valued by the Public Service Commission of New York for rate-making purposes and that they have deteriorated since that time. We can not agree that this figure represents a correct valuation of the company's property for the purpose of determining whether an unsecured creditor can collect on its debt. As the Supreme Court said in *Group of Institutional Investors* v. *Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U. S. 523, 540:

\* \* \* Mr. Justice Brandeis once stated that "value is a word of many meanings." See *Southwestern Bell Telephone Co.* v. *Public Service Comm'n.*, 262 U. S. 276, 310, concurring opinion. It gathers its meaning in a particular situation from the purpose for which a valuation is being made. Thus the question in a valuation for a rate making is how much a utility will be allowed to earn. The basic question in a valuation for reorganization purposes is how much the enterprise in all probability can earn. \* \* \*

For the purpose of determining the collectibility of unsecured debts, we too are concerned with future earning capacity and will not be guided by a valuation for the purpose of fixing rates.

The $2,991,100 valuation of the Public Service Commission espoused by petitioner was never reviewed and is inconsistent with every other valuation in the record. Considering the price petitioner paid for its stockholdings in South Bay and the long term indebtedness of South Bay at the time of the purchase, petitioner itself valued the company at well over $4,000,000. Also, in contrast to the value of South Bay properties found by the Public Service Commission of New York is

the valuation of $5,876,770 made by the engineering firm of Stone & Webster in 1930. Finally, we note that the South Bay financial statement of 1941 which valued the utility plant, less reserve for depreciation, at $6,131,727.90 was incorporated in the financial statement of petitioner for the same year. The close affiliation between Federal Water Service Corporation, petitioner, and South Bay, with interlocking officers and directors, indicated an integrated group of utility companies. As between them the control and franchise of South Bay may well have had a potential value not reflected in a public market and account for this valuation. This sum exceeded the long term liabilities of South Bay at the close of 1941 by $2,156,481.96 and current liabilities exceeded current assets by only $1,859.05 in this year. Suffice it to say petitioner has not established to our satisfaction that South Bay's properties were not adequate to cover the company's open account indebtedness to petitioner.

Petitioner stresses the fact a $227,960 demand note of South Bay was revalued by Federal Water Service Corporation at $1,000 in June 1941 as a part of a general mark down of its investments before the Securities Exchange Commission would approve its recapitalization. Due to the fact that the evidence does not contain any record of the Securities Exchange Commission proceedings, this fact loses its significance as corroborating evidence of the financial weakness of South Bay in 1941. Assuming that Securities Exchange Commission required a revaluation of this particular asset, we are not told the reasons therefor and are thus unable to judge their soundness. One possible explanation is the fact that interest payments on the note were subordinated to the payment of dividends on South Bay cumulative preferred stock. As a consequence, South Bay owed accrued and unpaid interest of $144,456.37. In the absence of any supporting evidence, we are not able to attach significance to this portion of petitioner's argument.

Other factors which were present at the close of 1941 point to the future financial soundness of South Bay. Since payments of interest on corporate indebtednesses played such a big part in the company's yearly net losses, it is significant that during the years 1937–1941 the total of South Bay's fixed debt was reduced from $3,157,500 to $3,119,-000. As evidence of the moderate expansion of South Bay's facilities during the 5-year period, the number of hydrants in use rose steadily from 2,877 in 1936 to 3,008 in 1941 and the number of services connected increased from 15,784 to 17,186 over the same years. As an indication of the way the properties of the company were maintained during this period, we find that the amounts expended on additions and improvements were over $60,000 each year and always far exceeded the value of property retired from service. At December 31, 1941, South Bay had available unpledged expenditures for additions and improvements in the amount of $49,265.13.

A significant sign of South Bay's financial·soundness during the years in question is the fact that there is no evidence petitioner took any step to reorganize its debtor's capital structure despite the adversities suffered. Petitioner answers that such a step was not taken because to have demanded it would have resulted in participation only by the secured creditors to the exclusion of its unsecured claim. Whether this is true or not depends on the valuation placed on the company's properties. Valuation of South Bay's assets for purposes of recapitalization depends on its prospective earnings, *Consolidated Rock Products Co.* v. *Du Bois*, 312 U. S. 510, 525, and petitioner has not shown that in 1941 South Bay's prospective earnings were such as to prevent participation in a reorganization by petitioner.

Thus we conclude that at the close of 1941 South Bay was still very much of a going concern, with expanding facilities, increasing operating revenue, and reduced funded indebtedness. While South Bay's prospects were not bright at the close of 1941 unless the company's affairs were readjusted and there was some unforseen change in the development of localities served by the company, yet it was in no imminent financial danger at this time.

Turning from the general financial condition of South Bay during the years 1937–1941, we find significant indications that petitioner's advances to South Bay were not worthless from the manner in which the open account was treated by both debtor and creditor. Repayments on the loans totaling $795,100 after 1936 is impressive evidence of the collectibility of the advances. It is notable that $161,900 of this total was repaid in 1941, the year petitioner says the account was worthless. Surely this is not the sign of a worthless debt.

Another emphatic indication that petitioner's advances were not worthless in 1941 is the fact that petitioner continued to loan money on the open account during the years 1937–1941 in the total amount of $894,100, of which $161,900 was advanced in 1941. Where a creditor voluntarily advances further large sums to a debtor as petitioner did, it can hardly assert the worthlessness of the account on which the new advances were made. See *Jones* v. *Commissioner*, 38 Fed. (2d) 550; *Squier* v. *Commissioner*, 68 Fed. (2d) 25; *Harris* v. *Commissioner*, 140 Fed. (2d) 809; *Powers Mfg. Co.* v. *Commissioner*, 34 Fed. (2d) 255.

Furthermore, there is no evidence that petitioner made any effort to collect from South Bay the balance of the open account in any year after 1936. Nor is there proper proof that such an effort would have been futile, that a suit for the amount of this balance in 1941 would have yielded only a nominal amount after the secured creditors had been paid off. Mere nonpayment does not prove worthlessness of a debt. It must be remembered that petitioner was in control of the board of directors of South Bay and in a position to control the

amount of the repayments as well as the amount of the advances. The answer may have been that it was to petitioner's ultimate advantage to safeguard the financial stability of the debtor by not demanding prompt repayment of the advances, especially in view of the fact that it was receiving 6 per cent interest on them until January 1, 1941, but such a ground for failing to demand payment would not be a valid reason for claiming the debt was uncollectible.

The explanation in the financial statement of petitioner for 1938 for setting up the $2,000,000 reserve for stockholdings and advances to South Bay and investments in Western New York Water Co. does not indicate in any way that the open loan account was worthless. It merely states that little income had been received in the past and no income from these investments could be looked for in the nearby future. This is a far cry from saying there was no hope of recovery. No further explanation for retaining a reserve for the South Bay investments was given in petitioner's financial statement when the investment reserve was reduced as of December 31, 1941. We note also there is no evidence that the open account indebtedness was charged off against the $475,000 investment reserve set up for it either in 1941 or subsequently, indicating the error of petitioner's contention.

Finally, perhaps the most significant point concerning petitioner's treatment of its open loan account with South Bay is the fact that, while petitioner set up the reserve for it in 1938, it waited until 1945 to attempt to deduct it as a reasonable addition to the bad debt reserve in a claim for overpayment of taxes for 1941. No satisfactory explanation is given for not claiming this as a reasonable addition at the time petitioner's 1941 tax return was filed. Certainly if the chance for such a large tax deduction existed in 1941, we can not consider mere inadvertence as a sufficient explanation for not taking advantage of it.

We conclude that, even if at the close of 1941 there were some indications pointing to the possible eventual uncollectibility of petitioner's advances to South Bay, yet in 1941 the open loan account indebtedness was not worthless. See *Walter H. Goodrich, supra.* Mere doubtfulness did not make the debt worthless, while reasonable probability of collection remained. We therefore uphold respondent's disallowance of the full amount of $475,000 as an unreasonable addition to petitioner's reserve for bad debts in 1941.

Turning to the second question in this case, we must determine whether petitioner should have accrued and reported as income the unpaid interest due on its open account advances to South Bay in 1941, 1942, and 1943.

It is well settled that, before there is an obligation on a taxpayer to accrue and report unpaid interest on an obligation, there must be a reasonable probability of payment at the time the right to receive

it arises. *Corn Exchange Bank* v. *United States,* 37 Fed. (2d) 34; *Atlantic Coast Line Railroad Co.,* 31 B. T. A. 730; *Bettendorf Co.,* 34 B. T. A. 72; and *American Central Utilities Co.,* 36 B. T. A. 688. This doctrine is well stated in *Atlantic Coast Line Railroad Co., supra.* where we said:

> * * * If the facts indicate that there was a reasonable expectancy of receipt of the interest involved or that the petitioner would probably be able to collect such interest, then the full amount should have been accrued on its books and reported as taxable income, notwithstanding the obligation afterwards became uncollectible or worthless, and even though this occurred within the same taxable year. On the other hand, if the facts show that there was a reasonable doubt as to the ability of the Steamship Co. to pay the interest, or if it was reasonably certain for any reason that the interest would never be received, petitioner was justified in reporting only such amounts as were actually paid by the Steamship Co. and received by it in each year.

Thus we must determine in the instant case whether in 1941, 1942, and 1943 there was a reasonable probability of payment of the interest owing on the open account by South Bay. To determine this matter we may examine all relevant circumstances which existed before the close of the year 1943.

In support of its contention that there was no reasonable probability of collecting the interest, petitioner sets forth some of the same points made under the first issue regarding the general financial deterioration of South Bay, merely carrying them down to the close of 1943; that is, that South Bay operated at a loss in every year but 1937, that its deficit continued to grow year by year, that the fixed indebtedness of South Bay exceeded the value of its properties, that South Bay defaulted on its payments under the trust indenture for first and refunding mortgage 5 per cent gold bonds in 1942 and 1943, and that the principal amount of its indebtedness to petitioner on the open loan account was worthless.

We evaluated these points in detail in deciding the first issue, and feel that further discussion of them is not justified by any radical changes in 1942 and 1943. It is true that evidences of South Bay's financial unsoundness continued in 1942 and 1943, but at the close of 1943 the company was still very much of a going concern, its operating revenue remained large, its funded indebtedness was being reduced and interest payments thereon continued, and such additions and betterments as were procurable during the war were being made to maintain the plant in proper running order. There was no hint of impending insolvency or a reorganization. We conclude that at the close of 1943, though South Bay's financial future was still subject to doubt, it was in no such straits as would support the conclusion that there was no reasonable probability that the interest due in 1941, 1942, and 1943 would be paid.

Turning from the general economic condition of South Bay during

the years 1941–1943 to circumstances directly connected with the interest payments on the open loan account of petitioner, we find it significant that there is no long history of default on the interest due. Nor is the amount of unpaid interest so large as to discourage hope of future payment. While petitioner had the right to apply the repayments of South Bay to the principal of its advances rather than to interest, yet the very fact that the repayments were far in excess of the interest owing in each of the years 1941, 1942, and 1943 greatly weakens petitioner's contention that the interest due in this period was uncollectible. See *Bettendorf Co., supra.* In view of the close relationship between creditor and debtor, the fact that South Bay accrued the interest as an expense and deducted it, while not controlling on petitioner, is still a highly significant indication that petitioner ought to have accrued it and reported it as income. See *Bettendorf Co., supra.* Despite its control over South Bay, we note there is no evidence in the record that petitioner ever attempted in any manner to enforce collection of the overdue interest. We are not satisfied that to have instituted suit for the interest would have served no purpose on the ground that petitioner as an unsecured creditor would receive only a nominal sum. We may not assume that interest is uncollectible simply because there has been no effort to collect it.

We conclude petitioner has failed to sustain its burden of proof that in the years 1941, 1942, and 1943, when interest on the open account indebtedness of South Bay became due, there was no reasonable probability it would be paid. We therefore uphold respondent's determination that petitioner must accrue and report as income the respective amounts of interest which it was entitled to receive in each of those years. If such interest subsequently becomes uncollectible, petitioner has its remedy in claiming a deduction therefor.

Based upon our earlier determination that petitioner was not entitled to a deduction of $475,000 in 1941, we hold petitioner had no net operating loss in 1941 to be carried forward to 1942.

*Decision will be entered for respondent.*