H. Wolff Book Manufacturing Co., Inc. v. Commissioner.
H. Wolff Book Mfg. Co., Inc. v. Commissioner
Docket No. 20018.
United States Tax Court
1950 Tax Ct. Memo LEXIS 50; 9 T.C.M. (CCH) 1012; T.C.M. (RIA) 50269; November 8, 1950
*50 Petitioner in 1942 sought as a deduction $26,818.53 for an addition to its reserve for bad debts. The Commissioner disallowed the claimed deduction and, in the alternative, any portion thereof, stating that reasonable provisions had been made in prior years for losses on account of bad debts in the taxable year. Held, on the facts, petitioner is not entitled to the deduction of $26,818.53, or any part thereof, as an addition to its bad debt reserve in 1942. Harry L. Brown, Esq., Rm. 1518, 125 Park Ave., New York 17, N.Y., and Nathan Eidenberg, C.P.A., for the petitioner. Michael Waris, Jr., Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: This proceeding involves deficiencies for the calendar year 1942 as follows: Income tax
$ 2,064.00
Declared value excess-profits tax
1,596.70
Excess profits tax
18,866.99
The issues presented are whether respondent erred in disallowing a claimed deduction of $26,818.53 as a reasonable addition to petitioner's reserve for bad debts for the year 1942, and, in the alternative, in failing to allow any portion of such claimed deduction. Findings of Fact The *51 petitioner, a corporation with offices at 508 West 26th Street, New York, New York, files its tax returns for the taxable year ended December 31, 1942, with the collector of internal revenue for the third district of New York. At all times material here petitioner kept its books on the accrual basis of accounting and maintained a reserve for bad debts. The petitioner was incorporated in December 1934 to take over and continue a business established to print and bind books upon orders from various publishers. It operates a complete book manufacturing plant and is one of the larger companies engaged in that business in the United States. In 1942 petitioner produced about sixteen or seventeen million books and employed about 625 persons. During the period from incorporation to and including the year 1942 there was no substantial change in the character of the business, the manner in which it contracted with various publishers or in the type of risks involved. The following table shows pertinent data relating to the petitioner's sales and receivables, and reserve for bad debts for the years 1935 to 1943, inclusive: Balance
Balance
Accounts
of Reserve
of Reserve
Receivable
for Bad
Worthless
for Bad
and Trade
Debts at
Accounts
Debts at
Notes - beginning
Charged
close
Year
Sales
Dec. 31
of year
Recoveries
Off
of year
1935
$1,129,244
$245,891.00
$10,179.19
$ 31.63
$ 1,966.83
$20,111.85
1936
1,349,887
268,653.00
20,111.85
238.15
7,206.25
30,383.15
1937
1,692,056
247,443.00
30,383.15
133.57
3,335.13
50,595.99
1938
1,458,621
233,892.00
50,595.99
999.05
1,111.01
64,484.03
1939
1,617,633
325,109.86
64,484.03
180.54
13,075.73
64,484.03
1940
1,872,099
369,931.48
64,484.03
8,763.36
64,484.03
1941
2,511,367
719,719.59
64,484.03
8,181.08
64,484.03
1942
2,535,406
684,507.43
64,484.03
26,818.53
1943
3,090,160
560,446.88
1,962.82
*52 Petitioner's total receivables, including notes, trade acceptances, accounts receivable, and open accounts, as of December 31, 1942, were $684,507.43. Of this amount, about $77,886.02 represented sales made prior to 1942: Amount of Receivables
Year of Sale
Still Unpaid in 1942
1936
$ 5,947.96
1938
6,730.97
1939
24,561.07 [1]
1940
3,463.81
1941
37,182.21
77,886.02
The terms of sale to the publisher were two per cent discount if paid by the 25th of the following month and if not paid in cash at that time, petitioner accepted a 90-day trade acceptance or note. However, in some instances petitioner was not able to obtain such notes. Between September 1, and December 31, 1942, inclusive, petitioner continued to make sales totaling about $40,503.49 to debtors having account receivable balances from sales prior to 1941. Prior to 1942, the petitioner had approximately 200 accounts on its books with publishing or other concerns, but on December 31, 1942, its accounts numbered approximately 125. It lost some of its business to out of town competitors during 1942 but replaced it with *53 new business in 1943. Of petitioner's $684,507.43 trade accounts and notes receivable balance on December 31, 1942, approximately $500,000 was due from seven accounts. Of the latter amount about $189,095 was owed by three debtors to whom petitioner continued to make sales and to extend credit during 1942 despite the fact that petitioner considered those particular accounts to involve more risk than any other accounts on its books. Those three debtors and their respective accounts were as follows: A/R
N/R
Total
S. E. Lowe,
Inc.
$51,361.77
$ 51,361.77
Vanguard Press
37,003.37
37,003.37
Unicorn Press
13,639.42
$87,090.49
100,729.91
$189,095.05
S. E. Lowe, Inc. In May 1941 the petitioner and S. E. Lowe entered into an agreement to form a corporation for the purpose of creating books for children to be sold to publishers. S. E. Lowe was to supply the ideas for the books, and sell them to publishers, and the petitioner was to manufacture the books. The agreement provided that each party thereto was to share equally the losses and gains of the business. Pursuant to the terms of the agreement S. E. Lowe, Inc., (hereinafter referred *54 to as the corporation) was formed in May 1941. The petitioner and S. E. Lowe each owned 50 per cent of the stock. At the end of 1941 the corporation owed the petitioner approximately $90,000, but by the end of 1942 it had reduced the amount owed the petitioner to approximately $51,361 as noted above. About $17,044 of this amount represented receivables arising from sales made between September and December 1942. During 1942 the petitioner began to dissolve the corporation because it could not make S. E. Lowe conform to the agreement of May 1941. But, in view of the fact there were books in process which had to be completed and delivered to customers, dissolution was not completed until 1944. Subsequent to 1942, but prior to the end of 1944, the petitioner collected from the corporation approximately $26,000. Pursuant to the terms of the agreement of May 1941, S. E. Lowe paid to the petitioner in 1944 fifty per cent of the balance of about $25,000 which the petitioner had failed to collect up to that time. The petitioner then charged off as worthless the approximate $12,000 balance uncollected from the venture. At or about this time petitioner sold its stock interest in the corporation *55 which had cost it $250, to S. E. Lowe for $2,500. Vanguard Press, Incorporated At the end of 1939 Vanguard Press, Incorporated, (hereinafter called Vanguard), was indebted to the petitioner in the amount of approximately $24,561. Payments from Vanguard had been slow. An agreement was entered into between the petitioner and Vanguard whereby the petitioner agreed to do business with Vanguard, and Vanguard to give all its business to the petitioner and to keep all accounts arising out of that business current by making monthly payments. The petitioner also agreed not to demand payment of about $24,561 due at that time, but to accept payments in reduction of that indebtedness as made by Vanguard. Subsequent to this agreement petitioner effected sales to Vanguard of $7,000 or $8,000 in December 1941. The balance sheet of Vanguard as of December 31, 1941, showed, inter alia, the following: Current assets
$37,187.56
Tangible non-current assets
24,324.10
Total assets
61,511.66
Current liabilities: Accounts payable - trade
$15,393.25
Accounts payable - others
321.16
Royalties payable
7,342.99
Other current liabilities
1,420.67
Trade account payable - Deferred to
January 1, 1942
24,561.07
Note payable - Officer - Deferred to
January 1, 1942
12,500.00
Total current liabilities
61,539.14
Other liabilities: Loans payable - due October 23,
1942 *
22,500.00
$84,039.14
*56 At December 31, 1941, Vanguard had no contractual commitments that required capital beyond that needed in the ordinary course of business. As of December 31, 1942, Vanguard was indebted to the petitioner in the amount of $37,003, including the $24,561 from sales in 1939. The remaining $12,442 of this amount represented additional sales made to Vanguard by petitioner between September and December 31, 1942. In addition to making current monthly collections for all sales made to Vanguard after entering into that agreement, the petitioner received payments on the $24,561 indebtedness in sufficient amounts to reduce that indebtedness to about $12,000 at the time of the hearing, at which time the petitioner was still doing business with Vanguard. No portion of the Vanguard account has ever been charged off as worthless. Unicorn Press Unicorn *57 Press is a partnership engaged in the book publishing business. It consists of two individuals each of whom owns a fifty per cent interest therein. At the end of 1942, each partner owned and possessed, exclusive of partnership assets, assets valued between $7,000 and $12,000. The petitioner held notes and receivables from Unicorn at the end of 1941 in the amount of about $96,000. Unicorn completed payment on all those notes and accounts prior to December 1942. At the end of 1942 the petitioner held notes and receivables from Unicorn in the amount of about $100,729 arising from sales made on dates ranging from October 1942 to December 1942. Unicorn, though ordinarily late in paying, completed payment on all those notes and accounts by the middle of 1943. The petitioner continued doing business with Unicorn during 1943 on an increasing scale and by June 1943, Unicorn was indebted to it in connection with that 1943 business in the amount of approximately $70,000. For the year 1942 petitioner's reserve for bad debts and charges against it were: Balance as of January 1, 1942
$64,484.03
Charges (Accounts written off and
charged to reserve)
26,818.53
Balance as of December 31, 1942
$37,665.50
*58 On its tax returns, petitioner claimed as a deduction from gross income the amount of $26,818.53, which deduction represented an addition to the reserve. The Commissioner in his deficiency letter disallowed the deduction stating that the amount claimed did not constitute a reasonable addition to the reserve, reasonable provisions having been made in prior years for losses on account of bad debts in the taxable year involved. The petitioner's reserve, for bad debts at the end of 1942 was adequate to take care of any and all losses which the petitioner could reasonably have expected at that time. Opinion The issues presented for decision are whether respondent erred in disallowing a claimed deduction of $26,818.53 as a reasonable addition to petitioner's reserve for bad debts in 1942 and, in the alternative, in disallowing any portion of the claimed deduction. Section 23 (k) (1) of the Internal Revenue Code is the effective statute which allows the deduction of "Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; * * *" The effective regulation is Regulations *59 111, section 29.23 (k)-5, which appears in the margin. [2]
*60 The petitioner has the burden of proof to show that the $26,818.53 addition to its reserve in 1942 was reasonable, and that the Commissioner's disallowance thereof was arbitrary or capricious, since allowance of the addition as a deduction for bad debts is by the language of the statute left within the discretion of the Commissioner and he has disallowed the deduction of the $26,818.53 in full. As we said in Walter H. Goodrich & Co., 40 B.T.A. 960, 961-962: "* * * Unless his [the Commissioner's] refusal to permit such a deduction is capricious or arbitrary, or otherwise an abuse of discretion, the Board should be slow to override it. Certainly it may not merely substitute its judgment for that of the Commissioner as if the statute contained no such condition and the Board were simply to decide de novo whether the claimed addition to the reserve were reasonable." See New York Water Service Corporation, 12 T.C. 780; C. P. Ford & Co., 28 B.T.A. 156; and Art Metal Const. Co. v. United States, 17 Fed. Supp. 854. What is a reasonable addition to the reserve, or whether any addition thereto is necessary depends upon the nature *61 of the business, conditions of business prosperity, past experience in collecting accounts and bad debts, the amount of the existing reserve, and the other particular facts of the case. Black Motor Co., Inc., 41 B.T.A. 300; affirmed, 125 Fed. (2d) 977; Regulations 111, section 23 (k)-5. Thus considered, the evidence fails to establish that the Commissioner's determination was arbitrary or capricious and affords no basis for interference by the Court with that determination. The petitioner's collection experience immediately prior to and during the taxable year, in 1941 and 1942, indicated no need for additional reserves. As a matter of fact, petitioner's overall credit picture was improving. Thus, while gross sales were increasing from $2,511,367 to $2,535,406, the balance of receivables and trade notes outstanding was reduced from $719,719.59 to $684,507.43. Bad debt expectancy as determined from petitioner's experience since its formation in 1935 indicates no reasonable need for a reserve as large as that claimed on the returns. An analysis of notes and receivables and net charge-offs for the period 1935 through 1942 indicates an eight-year average *62 of $8,609.37 bad accounts out of an average, of $386,893.42 accounts receivable, or about 2.225%. If this percentage be applied to the 1942 accounts receivable and trade notes totaling $684,507.43, the resulting bad debt expectancy figure is about $15,230.29. This is to be compared with the $37,665 already in the reserve (the amount the Commissioner considers reasonable) and the $26,818.53 petitioner proposes to add. The reserve of some $37,665 exceeded the $34,466.31 total of losses sustained over a five-year period preceding the taxable year. The largest annual bad debt loss sustained by petitioner in its entire history prior to 1942 was the 1939 charge-off of $13,075.37, an amount which was less than one-half of the 1942 reserve. The petitioner has not produced any evidence of the effect of war conditions, or conditions of business prosperity, or of changes in the publishing industry which might warrant the claimed addition and minimize the indication of past experience that no such addition was needed. Petitioner has pointed to increased concentration of receivables into 125 accounts from prior totals of about 200, as indicating a change within the business itself which justifies *63 greater reserves. But increased concentration of receivables is in itself indicative of neither greater nor lesser overall credit risk in the absence of comparative data as to the nature of the accounts handled in the years to be compared. The petitioner has also pointed to the financial difficulties and the relative delinquency of three large accounts totaling about $189,095 to justify the claimed addition. Where a specific account or accounts of a taxpayer become worthless during the taxable year, the full amount of it may be included in its addition to reserve for bad debts and deducted if the aggregate addition to the bad debt reserve is reasonable. New York Water Service Corp., supra, and citations therein, at page 788. None of the three accounts: S. E. Lowe, Inc.; Vanguard Press, Incorporated; and Unicorn Press, became worthless during the taxable year. The petitioner itself evidenced confidence that the accounts were not yet worthless nor beyond hope of recovery when it continued to extend credit to them between September and December 1942. The financial difficulties of these three companies does not necessarily prove the worthlessness of their accounts, Walter H. Goodrich, supra, at page 962. *64 Upon all the evidence, we find that the Commissioner did not err in disallowing a deduction in the amount of $26,818.53 nor, in the alternative, any portion thereof, as an addition to the reserve for bad debts during the taxable year 1942. Decision will be entered for the respondent. Footnotes
1. Account of Vanguard Press, per agreement stated in findings below.↩
*. We are informed that the makers of the loans payable totaling $22,500, by agreement may at their option take capital stock of the corporation in lieu of cash at maturity, October 23, 1942. At December 31, 1941, accrued interest, if cash is elected, will amount to approximately $1,850.00 and is not included in the liabilities above.↩
2. SEC. 29.23(k)-5. RESERVE FOR BAD DEBTS. - Taxpayers who have established the reserve method of treating bad debts and maintained proper reserve accounts for bad debts, or who, in accordance with section 29.23(k)-1, adopt the reserve method of treating bad debts, may deduct from gross income a reasonable addition to a reserve for bad debts in lieu of a deduction for specific bad debt items. What constitutes a reasonable addition to a reserve for bad debts must be determined in the light of the facts, and will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. In case subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve should be reflected in the determination of the reasonable addition necessary in the taxable year. A taxpayer using the reserve method should make a statement in his return showing the volume of his charge sales (or other business transactions) for the year and the percentage of the reserve to such amount, the total amount of notes and accounts receivable at the beginning and close of the taxable year, and the amount of the debts which have become wholly or partially worthless and have been charged against the reserve account.↩