Calavo, Inc., and Calavo Growers of California, as successor to the assets and liabilities of Calavo, Inc. v. Commissioner.
Calavo, Inc. v. Commissioner
Docket No. 71187.
United States Tax Court
T.C. Memo 1960-242; 1960 Tax Ct. Memo LEXIS 47; 19 T.C.M. (CCH) 1359; T.C.M. (RIA) 60242; November 17, 1960
*47 Held, that since it has not been shown that a certain debt owing to Calavo, Inc. became worthless during the year in question, the amount of such debt may not be charged against the reserve for bad debts and thereby be reflected in the computation of the deductible addition to the reserve for bad debts for such year. Held further, that the respondent did not abuse his discretion in disallowing as a deduction the full amount claimed as a reasonable addition to the reserve. Section 166(c), Internal Revenue Code of 1954. Bruce I. Hochman, Esq., Marvin Goodson, Esq., and William E. Hannam, Esq., for the petitioners. Jack E. Roberts, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax of Calavo, Inc. for the taxable years ended September 30, 1953 and September 30, 1955, in the respective amounts of $14,834.46 and $10,616.87. The deficiency for the taxable year ended September 30, 1953, results from the respondent's determination that he erroneously allowed the deduction in that year of a tentative net loss carryback of $28,527.82 from the taxable year ended September 30, 1955. The issue presented is whether the addition of $52,183.80 made by Calavo, Inc. to its reserve for bad debts for the taxable year ended September 30, 1955, is deductible as a reasonable addition to the reserve within the meaning of section 166(c) of the Internal Revenue Code of 1954. *49 Findings of Fact Some of the facts are stipulated and are incorporated herein by this reference. Calavo Growers of California, hereinafter referred to as Calavo Growers, is a California corporation composed of avocado growers operating on a cooperative basis. For the taxable year ended September 30, 1955 and years prior thereto, it claimed the benefits of section 521 and section 522 of the Internal Revenue Code of 1954 and corresponding provisions of prior revenue laws. (The respondent ruled that it is not entitled to the benefits of those sections for subsequent years.) Calavo, Inc. was a California corporation during the year 1955 and years prior thereto and was a wholly owned subsidiary of Calavo Growers. It was engaged in the business of marketing the produce of its parent corporation and it also operated as a commission sales agent for various other growers and shippers, selling pineapples, avocados, limes, dates, figs, and other produce. It maintained offices in Chicago and other cities for this purpose. It kept its books on an accrual method of accounting and filed timely Federal income tax returns for the taxable years ended September 30, 1953 and *50 September 30, 1955, with the district director of internal revenue at Los Angeles, California. On September 30, 1955, a statutory merger, complying with section 4124 of the California Corporations Code (and being a nontaxable transaction under section 332(a) of the Internal Revenue Code of 1954), was effectuated between the two corporations, whereby Calavo Growers succeeded to the assets and liabilities of Calavo, Inc. Thereafter Calavo Growers continued the business of Calavo, Inc. and the consolidated belance sheet of both organizations as of September 30, 1955, became the new balance sheet of Calavo Growers. All of the accounts and activities of Calavo, Inc. were continued by Calavo Growers. On its books Calavo Growers thereafter carried all accounts of Calavo, Inc. for which Calavo, Inc. had set up a reserve for bad debts. A. C. Duarte, Inc., a Cuban corporation, had been a large supplier of produce, including pineapples and avocados, to Calavo, Inc. Commencing in 1954 Calavo, Inc. advanced substantial amounts to Duarte, Inc. pursuant to request from A. C. Duarte, in order that he might expend his operations in Cuba, particularly with respect to pineapples. *51 The books of Calavo, Inc. showed the following with respect to amounts owed by Duarte, Inc. as of September 30, 1955: Notes Receivable
$34,454.48
Open Account
8,289.91
Total
$42,744.39
During the summer of 1955 George B. Hodgkin, the general manager of Calavo, Inc. became concerned about the collectibility of the Duarte account. The sales of produce which Duarte, Inc. was shipping at that time brought so little that, after paying transportation and taking out the commission, there was very little left to apply on the account. This resulted in part from the fact that there had been a decline in the price of pineapples. The question was raised at that time among the officials of Calavo, Inc., including Hodgkin, as to whether any further advances should be made, as requested by Duarte. It was decided that further advances should be made in order to attempt to recoup, from further shipments, the amounts which had already been advanced, although the prospects appeared bad. Accordingly, one or two further advances were made. However, sometime in August 1955, it was decided that no further money would be risked and Calavo, Inc. ceased to make further advances. Calavo, *52 Inc. also adopted the practice of not remitting to Duarte, Inc. any amount of the proceeds of sales of produce furnished by him. On September 19, 1955, Calavo, Inc. did remit to A. C. Duarte, Inc. by check an amount of $1,313.64 on account of sale of avocados, but this apparently was an oversight since Hodgkin, as general manager, had given orders to withhold any payments to Duarte, Inc. Although Calavo, Inc. had pursued a policy of making advances had always been repaid. However, to some of its other shippers, the advances had always been repaid. However, when this difficulty arose with respect to the Duarte account Calavo, Inc. adopted a policy of restricting advances to shippers, except advances on shipments that had already been received, to the amount of $10,000, unless approved by the board of directors. All sales of produce by Calavo, Inc. were on account. The usual practice was to require payment in 7 days, except that in some cases 30 days was permitted. With respect to these accounts receivable the amount which became bad was relatively small, as shown infra. On November 12, 1955, attorneys in Cuba representing Calavo, Inc. advised Hodgkin by letter that they had made *53 an investigation of the fianancial condition of A. C. Duarte, Inc., that it was found to be an insolvent concern, that it had made a proposal to creditors to pay off 50 per cent of its obligations over a three-year period, and that in the opinion of such attorneys the debtorcorporation could not live up to its proposal to pay off 50 per cent as proposed. By letter dated November 22, 1955, Calavo, Inc. was advised by its California attorneys that, based upon the letter from the Cuban attorneys, they were of the opinion that the A. C. Duarte, Inc. account was not over 50 per cent collectible, and that whether even such an amount might be collected could not be ascertained from the information available. In November, 1955, Hodgkin, and William P. Black, director of marketing for Calavo, Inc., visited with Duarte in Florida and concluded that there was little or no hope of collection from Duarte, Inc. By letter dated December 9, 1955, the Cuban attorneys advised the California attorneys that further investigation had lead them to conclude that it would be very difficult to collect even a portion of the amount owing from A. C. Duarte, Inc. to Calavo, Inc. During the taxable year *54 of Calavo Growers ended May 30, 1959, $4,488.59 was recovered on the Duarte account. This represented the total recovery. Calavo, Inc. maintained a reserve for bad debts and this was carried over into the merged corporation. After the close of the taxable year ended September 30, 1955, the auditors of Calavo, Inc. prepared an audit of its books and records, which was completed during the last week of November, 1955. After such audit was completed, and relying upon the advice of the auditors, the attorneys, and the comptroller of Calavo, Inc., Hodgkin decided to increase the reserve for bad debts of Calavo, Inc. as of the close of the taxable year ended September 30, 1955, by an amount of $52,183.80, and this was done, resulting in a balance in such reserve as of that time of $61,000. The following is an analysis of the reserve for bad debts of Calavo, Inc. for the taxable years ended September 30, 1949 through September 30, 1955: CALAVO, INC
Amount
Charged
Amount
Against
Added to
Reserve
Reserve
Reserve
Balance
Bal. 9-30-49
$ 9,648.00
Yr. ended 9-30-50
$2,060.00
$ 2,060.00
9,648.00
Yr. ended 9-30-51
4,131.00
5,483.00
11,000.00
Yr. ended 9-30-52
941.00
941.00
11,000.00
Yr. ended 9-30-53
3,519.00
3,519.00
11,000.00
Yr. ended 9-30-54
3,832.00
3,832.00
11,000.00
Yr. ended 9-30-55
2,183.80
52,183.80
61,000.00
*55 The gross sales of Calavo, Inc. for the taxable years ended September 30, 1951 through September 30, 1955, and the total amount shown on the returns as notes and accounts receivable at the end of each year, were as follows: CALAVO, INC.
Notes and Acts.
Calavo Growers
Companion
Rec. Outstanding
Year Ended
Pool Sales
Item Sales
Total Sales
at End of Year
9/30/51
$6,510,239.00
$4,513,095.00
$11,023,334.00
$337,864.56
9/30/52
7,373,644.00
5,481,822.00
12,855,466.00
360,147.98
9/30/53
7,313,275.00
5,759,566.00
13,072,841.00
427,647.45
9/30/54
7,389,000.00
6,165,177.00
13,554,177.00
729,184.38
9/30/55
9,597,292.73
6,860,105.10
16,457,397.83
682,670.91
On January 11, 1956, a return was filed on behalf of Calavo, Inc. for the taxable year ended September 30, 1955, showing a net loss of $28,527.82, which reflected the deduction of the amount of $52,183.80 which had been added to the reserve for bad debts as of the end of that year. On January 11, 1956, there was filed in the name of Calavo, Inc. an application for a carry-back adjustment for the taxable year ended September 30, 1953, in the amount of $28,527.82, *56 representing a claimed net operating loss for the taxable year ended September 30, 1955. The respondent tentatively allowed a net operating loss deduction and made a refund for 1953 in the amount of $14,834.46. In the notice of deficiency and respondent in determining the deficiency for the taxable year ended September 30, 1955, determined the net income as follows: Net income(loss) as disclosed by
return
($28,527.82)
Additional income: (a) Reserve for bad debts
61,000.00
Net income adjusted
$32,472.18 His explanation was as follows: It is determined that the amount of $61,000.00, representing the balance in your reserve account for bad debts at the time of your liquidation and dissolution as of the close of the taxable year ended September 30, 1955, is includible in taxable income. In determining the deficiency for the taxable year ended September 30, 1953, the respondent determined that he had erroneously allowed a net operating loss carryback of $28,527.82 from the taxable year ended September 30, 1955, and therefore restored such amount to taxable income for the taxable year ended September 30, 1953. The respondent's explanation was as follows: *57 The net operating loss deduction of $28,527.82 claimed in your Application for Tentative Carryback Adjustment filed on January 11, 1956, based upon a net operating loss carryback from the taxable year ended September 30, 1955, has not been allowed inasmuch as it has been determined herein that you had net income of $32,472.18 for such taxable year. Opinion In the notice of deficiency the respondent determined that the amount of $61,000, representing the balance in the reserve for bad debts of Calavo, Inc. as of the close of the taxable year ended September 30, 1955, should be restored to income on the ground that Calavo, Inc. was liquidated and dissolved at that time and that, therefore, the need for maintaining the reserve for bad debts ceased. However, on brief he concedes that the evidence introduced indicates that this rationale is inapplicable and that Calavo, Inc. is entitled to maintain a reserve as of the end of the taxable year in question. The amount which he concedes as a proper reserve as of that time is $8,816.20, being the amount of the reserve at the beginning of the year, $11,000, less the amount charged during the year against the account for bad debts during *58 the year, namely, $2,183.80. Thus, the respondent has disallowed as a deduction the total amount of $52,183.80 claimed as an addition to the bad debt reserve of Calavo, Inc. for the year in question, on the ground that it is not a reasonable addition within the meaning of section 166(c) of the Internal Revenue Code of 1954. There are set forth in the margin applicable provisions of the 1954 Internal Revenue Code and the Income Tax Regulations thereunder. [1]
*59 In R. Gsell & Co., 34 T.C. 41, we set forth the guiding principles with respect to the use of the reserve for bad debts as follows: Section 23(k)(1) of the 1939 Code permits a deduction from income, in the discretion of the Commissioner, of a reasonable addition to a reserve for bad debts. Great latitude is extended the Commissioner in exercising that discretion; and the burden of establishing an abuse of discretion falls heavily upon the taxpayer. Union National Bank & Trust Co. of Elgin, 26 T.C. 537 (1956). Essentially, a bad debt reserve constitutes an estimate of those losses which can reasonably be expected to result from current business debts. In every case, then, the ultimate question is not whether the proposed addition to the reserve is sufficient to absorb the estimated losses, but rather whether the credit balance in the reserve is adequate for that purpose. Platt Trailer Co., 23 T.C. 1065 (1955). While the reasonableness of an addition to the reserve ordinarily will be judged in the light of the taxpayer's experience in collecting its accounts, no hard and fast standard should be adopted. A formula which may have produced *60 a reasonable addition over a series of years might very well prove inadequate under the circumstances attendant upon the year involved. Black Motor Co., 41 B.T.A. 300 (1940), affd. 125 F. 2d 977 (C.A. 6, 1942). In the final analysis, the estimate as to the reserve required for any given year will be measured in light of the conditions which exist at the time the estimate is made. Primarily, the reasonableness of any addition will depend on the total amount of debts outstanding at the close of the year, including current debts as well as those which arose in prior years, and the total amount of the existing reserve. It clearly appears that the addition of $52,183.80 was made up of additions arising from two types of indebtedness owing to Calavo, Inc., namely, the accounts receivable resulting from sales of produce, and the notes and loans receivable resulting from advances to certain shippers. In each of the three preceding taxable years, namely, the years ended September 30, 1952, 1953, and 1954, Calavo, Inc. charged against its reserve for bad debts those debts which actually became worthless in those years, but added back to the reserve an equal amount *61 in each year, resulting in a credit belance in the reserve at the end of each of those years of $11,000. In the year in question, the taxable year ended September 30, 1955, it charged against the reserve for bad debts an amount of $2,183.80, which apparently represented its ordinary accounts receivable which became bad during the taxable year, and then, as it did in prior years, it added this same amount to the reserve as of the close of the year. In view of the experience of prior years with respect to bad debt losses on its regular accounts receivable, and in view of the amount charged against the reserve in the year in question as losses from accounts receivable, it would appear that a credit balance of $8,816.20 in the reserve (conceded by the respondent) would be adequate, if not more than adequate, to cover any prospective losses on such accounts receivable outstanding at the end of the year in question. It is recognized, of course, that past experience is not the sole test, and that there should be taken into consideration any business conditions which might be reasonably considered as affecting the collectibility of the outstanding accounts as of the end of the year. However, *62 there has been no showing of any existing conditions which would indicate a higher rate of loss on the ordinary accounts receivable than was experienced in the past. The remainder of the claimed addition to the reserve for bad debts, namely, $50,000, apparently represented the addition to cover bad debts arising from advances to shippers. Calavo, Inc. had pursued the policy of making advances to some of its shippers and in the past had experienced no loss with respect to such loans. However, in the summer of 1955 the management of Calavo, Inc. became concerned about the collectibility of the amount which had been advanced in 1954 and 1955 to A. C. Duarte, Inc., for the purpose of expanding his operations. The amount owing from A. C. Duarte, Inc. as of the close of the taxable year was $42,744.39. It appears that Duarte, Inc. had ceased to make repayments, partly because there had been a drop in the market for pineapples. Prior to Sepember 30, 1955, the management of Calavo, Inc. had decided to cease making advances to this shipper and also had adopted the policy of not making any remittances from sales of shipments. The testimony of Hodgkin, manager of Calavo, Inc., was to the *63 effect that in view of the trouble Calavo, Inc. was experiencing in collecting this particular account consideration was given to all other accounts of this nature and that it was decided that a proper addition on account of this and other similar accounts should be $50,000. Actually there was no evidence presented as to how many such accounts there were or what amount had been advanced to others. Nor does the record disclose anything about the financial condition of such other shippers or the types of produce which they furnished. The only direct evidence as to uncollectibility of any amounts advanced to shippers relates solely to the amount advanced to Duarte, Inc. Under the reserve method, losses on individual accounts are not deductible. Any debts which become worthless during the taxable year are chargeable against the reserve, resulting in a reduction thereof. There is then allowed as a deduction the proper amount representing an addition to the reserve necessary to bring the balance in the reserve to an amount which can be reasonably expected to cover anticipated losses on the accounts outstanding at the end of the year. It is only in this manner that specific accounts which *64 become bad may affect the reasonable addition to the reserve which the taxpayer is entitled to deduct. However, no specific debt is taken into account even in this indirect manner unless it becomes worthless during the taxable year in question. New York Water Service Corp., 12 T.C. 780; William Purvin, 6 T.C. 21; Houston Chronicle Publishing Co., 3 T.C. 1233; and Paramount Liquor Co. v. Commissioner, (C.A. 8), 242 F. 2d 249, affirming a Memorandum Opinion of this Court. We turn then to a consideration of whether the A. C. Duarte account became worthless during the taxable year ended September 30, 1955. It appears that during that year Calavo, Inc. had continued to make advances to Duarte, Inc. and that it was not until sometime in August 1955, that the decision was reached to cease making such advances. From the record it appears that this decision was reached because Duarte, Inc. was not making payments on its account, and because very little profit was being made on the shipments made by Duarte, Inc., since there had been a decline in the price of pineapples. While it is quite evident from the record that in the latter part of *65 the year the management of Calavo, Inc. was concerned about the collectibility of this account, such management did not conclude during the year that the account was worthless. Nor does the evidence which has been adduced establish that the account was in fact worthless in such year. It was not until November 1955, that the Cuban attorneys advised Calavo, Inc. that their investigation had disclosed that Duarte, Inc. was insolvent and had made an offer to pay 50 per cent of its debts over a 3-year period, that the California attorneys of Calavo, Inc. advised that in their opinion the account was not over 50 per cent collectible and that representatives of Calavo, Inc. visited Duarte in Florida and concluded that there was little or no hope of collection from Duarte. And it was not until December 1955, that the Cuban attorneys advised that further investigation led them to conclude that it would be very difficult to collect even a portion of the amount owing. Upon this evidence we cannot conclude that Calavo, Inc. has shown that this account became worthless in the year in question. Furthermore, no portion of this account was charged against the reserve in the year in question. Rather, *66 the evidence indicates that the amount of the Duarte, Inc. account may have been charged against the reserve in the fiscal year ended September 30, 1957. Accordingly, it is our opinion that the Duarte account is not properly chargeable against the reserve for bad debts as of September 30, 1955, and that hence it is not to be taken into account in any manner in fixing a reasonable addition to the reserve for bad debts in the year in question. Furthermore, as has been indicated hereinabove, there has been no showing that the reserve should be increased because of any existing conditions affecting the collectibility of any other advances of this nature. As stated, Calavo, Inc. had had no bad debt experience with respect to similar accounts. Since it does not appear that the respondent abused his discretion in disallowing the full amount of the claimed addition to the reserve, his determination in this respect is approved. We express no opinion as to the proper year for charging the Duarte, Inc. debt against the reserve. In view of the foregoing, it appears that Calavo, Inc. did not have a net operating loss for the taxable year ended September 30, 1955, and that therefore the respondent's *67 determination as to the taxable year ended September 30, 1953, is correct. Decision will be entered under Rule 50. Footnotes
1. Section 166 of the Internal Revenue Code of 1954 provides in part as follows: (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *
(c) Reserve for Bad Debts. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. Section 1.166-4 of the Income Tax Regulations provides in part as follows: (b) Reasonableness of addition to reserve - (1) Relevant factors. What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. (2) Correction of errors in prior estimates. In the event that subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve shall be reflected in the determination of the reasonable addition necessary in the current taxable year.↩